ROBERT E. ATKINSON, ESQ.
Nevada Bar No. 9958
*Oregon Pro Hac Admission Pending*
Email:  r.atkinson@kupperlin.com
**KUPPERLIN LAW GROUP, LLC**
10120 S Eastern Ave, Suite 202
Henderson, NV 89052
Telephone: (702) 614-0600
Facsimile: (702) 614-0647
*[Proposed] Reorganization Counsel for Debtor*

BRIAN T. HEMPHILL, ESQ.
Oregon State Bar #01284
Email:  brian@hemphill-attorney.com
**BRIAN T. HEMPHILL, P.C.**
339 SW Century Drive, Suite 101
Bend, OR 97702
Telephone: (541) 382-2991
Facsimile:  (541) 550-2007
*Local Associated Counsel for Debtor*

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>    AIRCRAFT INVESTOR RESOURCES, LLC<br>    a Nevada limited liability company;<br><br>                    Debtor | Case No.  09-38458-RLD11<br>Chapter 11 voluntary |

### MOTION TO REJECT GROUND LEASE AND SUB-LEASE THEREUNDER

        AIRCRAFT INVESTOR RESOURCES, LLC, the debtor and debtor-in-possession ("Debtor") in the above-captioned case, moves this Court for an order that authorizes rejection of a certain ground lease and sublease thereunder.

        This motion is based on the arguments set forth herein, the Omnibus Declaration of Christopher Sanders in Support of Debtor's Motion to Reject Leases and Motion to Avoid Rent Lien and Approve Procedures ("*Sanders Declaration*") filed contemporaneously herewith, and any evidence and representations that may be provided at the hearing on this Motion.

-1-

DATED:  October 20, 2009              By:  _____/s/ Robert Atkinson_____
                                           ROBERT E. ATKINSON, ESQ.
                                           Nevada Bar No. 9958
                                           *Oregon Pro Hac Admission Pending*
                                           *[Proposed] Counsel for Debtor*


                                      By:  _____/s/ Brian Hemphill_____
                                           BRIAN T. HEMPHILL, ESQ.
                                           Oregon State Bar #01284
                                           *Local Associated Counsel for Debtor*


## MEMORANDUM OF POINTS AND AUTHORITIES


### I.  JURISDICTION

1.      The Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C.

§1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b) and may be determined by the

Bankruptcy Court. Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.


### II. GENERAL BACKGROUND

2.      Debtor is in the aircraft manufacturing industry.  Its manufacturing capacity is in a

facility located at 22590 Nelson Rd, Bend, OR 97701 ("*Facility*").  The Facility parcel is owned by

the City of Bend, and is located on the grounds of the Bend Municipal Airport.  Sanders Declaration

at ¶1.

3.      In October, 2004, Debtor signed a 30-year and 9-month ground lease with the City of

Bend ("*Ground Lease*").  Under the terms of the Ground Lease, landlord is the City of Bend, and

tenant is Debtor Aircraft Investor Resources, LLC and a company called Quick-Turn Technologies,

LLC ("*Quick-Turn*") .[1]  *See* **EXHIBIT 1** and Sanders Declaration at ¶2.

---

[1]  On information and belief, Quick-Turn Technologies, LLC is actually Quick-Turn Technologies Nevada,
L.L.C., a Nevada limited-liability company.   Sanders Declaration at ¶2.

4.      In January 2005, a sublease agreement ("*Sublease*") on the Facility parcel was reached between Debtor and Quick-Turn (as sublessors) and ER1, LLC, a Delaware limited liability company ("*ER1*"), as sublessee.  Under the terms of the Sublease, ER1 constructed a large airplane hangar on the Facility parcel.  *See* **EXHIBIT 2**.

5.      In January 2005, a sub-sublease ("*Sub-Sublease*") was signed between ER1 (as sub-sublessor) and sub-sublessees Debtor, Quick-Turn, and also TAM-AIR, Inc, a Delaware corporation ("*TAM-AIR*").  The Sub-Sublease was styled as an "Improvement Lease" whereby ER1 rented the airplane hangar to be used by sub-subtenants as an airplane manufacturing facility.  *See* **EXHIBIT 3**.

6.      In July 2009, ER1 (as landlord under the Sub-Sublease) evicted Debtor (as tenant under the Sub-Sublease) for non-payment of rent.  Sanders Declaration at ¶3.

7.      Contemporaneous to the eviction, ER1 immediately claimed an Oregon statutory landlord's lien for unpaid rent on Debtor's personal property located on the Property.  Other than to provide for the removal of certain business records, ER1 has not permitted Debtor to remove its personal property without satisfaction of the unpaid back rent.  *Id.*

8.      ER1 subsequently declared the Sub-Sublease to be terminated.[2]  Sanders Declaration at ¶4.

9.      The majority of Debtor's approximately $20m worth of personal property is located at the Facility ("Personal Property").  It cannot re-start operations without obtaining possessory interest of the Personal Property.  Sanders Declaration at ¶5.

10.     **At the time of the eviction, the sole managing member of landlord ER1 was an individual named Rick Schrameck.  Mr. Schrameck was, at the time, also the sole managing member of tenant Debtor.**[3]  Sanders Declaration at ¶6.

11.     In short, Mr. Schrameck (as landlord) evicted his own company (as tenant).  *Id.*

12.     The majority members of Debtor and ER1 subsequently removed Mr. Schrameck from having any management responsibilities for either company.  Both Debtor and ER1 now operate

---

[2]  Furthermore, the Sub-Sublease terminated on its own terms: "Section 10.05. Automatic Termination. Notwithstanding any other term or provision hereof to the contrary, the Lease shall terminate on the occurrence of any act which affirms Landlord's intention to terminate the Lease as provided in Section 10.03 hereof, including the filing of an unlawful detainer action against Tenant …"

[3]  On information and belief, Schrameck was also (and still is) managing member of co-tenant Quick-Turn. Sanders Declaration at ¶6.

independently from each other, and maintain an adversarial position relative to the subject assets. Sanders Declaration at ¶7.

13.    Debtor is in default under Section 7.1.3 of the Ground Lease.  *Id.*

14.    On September 10, 2009 (the "Petition Date"), the Debtor commenced a voluntary Chapter 11 case in the District of Nevada.

15.    On October 13, 2009, the Nevada Court granted a creditor's motion to transfer the case venue to the District of Oregon, Portland Division.  *See* Docket Entry #50.

16.    On October 20, 2009, in a contemporaneous filing to this motion, Debtor has filed a motion to dismiss the case. ("*Motion to Dismiss*").  Debtor requests that this present motion be determined prior to any case dismissal.

## III.   RELIEF REQUESTED / LEGAL AUTHORITIES

17.    Debtor, under new management, is attempting to re-start operations.  Debtor is concerned that a continued Chapter 11 case will become problematic in its newly-designed plan to move forward.  *See* Motion to Dismiss.

18.    Debtor hence respectfully requests that this Court issue an order that the Ground Lease and Sublease are deemed rejected under 11 USC §365(a).[4]

19.    Generally, §365(a) allows a trustee or debtor-in-possession to either assume or to reject any executory contract as long as such assumption or rejection is in the best interests of the estate as reasonably determined by the trustee or the debtor-in-possession.  *See* Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989).  "The purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993) [quoting 2 *Collier on Bankruptcy* §365.01 (15th Ed. 1993)].

---

[4]  The Sub-Sublease is already terminated.  See Para. 8.

20.     The standard applied to determine whether the rejection of an unexpired lease should be authorized is the "business judgment" standard.  *See* <u>Nostas Assocs. v. Costich</u> (<u>In re Klein Sleep Products, Inc.</u>), 78 F.3d 18, 25 (2d Cir. 1996); <u>In re Orion Pictures Corp.</u>, 4 F.3d 1095, 1098-99 (2d Cir. 1993); <u>In re Child World, Inc.</u>, 142 B.R. 87, 89 (S.D.N.Y. 1992).  Courts defer to a debtor's business judgment in rejecting executory contracts or unexpired leases, and upon finding that a debtor has exercised its sound business judgment, approve such rejections under section 365(a) of the Bankruptcy Code.  *See* <u>Sharon Steel Corp.</u> at 39-40 (recognizing the "business judgment" standard, which requires only that the rejection will benefit the estate); <u>In re Trans World Airlines, Inc.</u>, 261 B.R. 103, 120 (Bankr. D. Del. 2001) ("A debtor's determination to reject an executory contract is governed by the business judgment standard.").  The business judgment standard is "not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate." <u>In re Exide Techs.</u>, 340 B.R. 222, 239 (Bankr. D. Del. 2006).

21.     Debtor has determined, in the sound exercise of its business judgment, that the rejection of the Ground Lease (and Sublease) is clearly in the best interest of the estate: Debtor currently has no ability to pay the arrearages due on the Ground Lease, nor has any desire or need to continue any relationship whatsoever with ER1.  Most importantly, Debtor has absolutely no need for the Ground Lease without concomitant tenancy rights to the hangar under the now-terminated sub-sublease.  <u>Sanders Declaration</u> at ¶8.  For these reasons, the Debtors believe their decision to reject the Apartment Lease satisfies the "business judgment" standard applicable to the rejection of unexpired leases of real property under 11 U.S.C. §365.

22.     Furthermore, Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  In a chapter 11 case, this 'doctrine of necessity' functions as a mechanism by which the bankruptcy court can exercise its equitable power.  *See* <u>In re Boston & Me. Corp.</u>, 634 F.2d 1359, 1382 (1st Cir. 1980).  Certainly, providing Debtor with the ability to move its property to another location so that it can resume operations is necessary and equitable relief.

23.     The request for the relief requested above is also made pursuant to Bankruptcy Rules 6006(a) and 9014, and also Local Rule 6006-1.  Because of the pending Motion to Dismiss, request

is further made to waive any 10-day stay that may otherwise be imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## VI. ADDITIONAL DISCUSSION REGARDING THE IMPACT OF REJECTION

### A. The Sublease

24.    Because Debtor is the sub-lessor under the Sublease, not sub-lessee, 11 U.S.C. §365(h)(1)(A) controls:

> (A) If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and—

>> (i) if the rejection by the trustee amounts to such a breach as would entitle the lessee to treat such lease as terminated by virtue of its terms, applicable nonbankruptcy law, or any agreement made by the lessee, then the lessee under such lease may treat such lease as terminated by the rejection; or

>> (ii) if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

25.    Under subsection (i), sublessee ER1 thus may terminate the Sublease, at its option. If ER1 does not do so, then under subsection (ii) it may retain certain rights, but only to the extent that such rights are enforceable under applicable nonbankruptcy law.

### B. The Ground Lease

26.    The rejection of the Ground Lease constitutes breach of that lease.  11 U.S.C. §365(g).

27.    Debtor is in default under Section 7.1.3 of the Ground Lease.[5]  Under Section 7.2.1 of the Ground Lease, landlord (*i.e.*, City of Bend) may thus terminate, or seek other remedies.  Under

---

[5]  Para. 13, *supra*.

-6-

Section 8.4 of the Ground Lease, one remedy is for a subtenant (*i.e.*, ER1) to step into the shoes of

Debtor and assume full tenant responsibilities.  *See* EXHIBIT 1.

28.     Debtor does not know what decisions ER1 and landlord City of Bend may make, but the

clearest option forward appears to be for ER1 to become tenant on the Ground Lease, which is

clearly a right it may enjoy under applicable nonbankruptcy law, if proffered by landlord City of

Bend.

///

///

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order granting the

relief requested herein.


DATED:  October 20, 2009            By:  _____/s/ Robert Atkinson_____
                                         ROBERT E. ATKINSON, ESQ.
                                         Nevada Bar No. 9958
                                         *Oregon Pro Hac Admission Pending*
                                         *[Proposed] Counsel for Debtor*


                                    By:  _____/s/ Brian Hemphill_____
                                         BRIAN T. HEMPHILL, ESQ.
                                         Oregon State Bar #01284
                                         *Local Associated Counsel for Debtor*

**EXHIBIT 1**

# Standard Airport Ground Lease

This **Airport Ground Lease** (this "Lease"), is effective as of this _7th_ day of October, 2004, between the **City of Bend**, an Oregon Municipal Corporation (hereinafter referred to as the **"Landlord"**) and **QUICK-TURN TECNOLOGIES, LLC, AND AIRCRAFT INVESTOR RESOURCES, LLC**, (hereinafter referred to as the **"Tenant"**).

## Recitals

A.      Landlord owns and operates the Bend Municipal Airport (the **"Airport"**).

B.      Landlord is desirous of entering into a ground lease with Tenant for an airport related manufacturing building.

## Article 1. Description and Use of Premises

**1.1**      **Description.** Landlord leases to Tenant, on the terms and conditions stated below, Land consisting of approximately 243,800 square feet, depicted and more particularly described on Attachment A, attached hereto (the **"Premises"**).

**1.2**      **Use of Premises.** Tenant primary use of the premises shall be the construction and maintenance of structures in which aircraft will be manufactured and the storage of manufactured aircraft in compliance with the City's General Aviation Minimum Standards ("GAMS"), which the City may amend from time to time as conditions warrant and which are incorporated in this lease. No other use may be made of the Premises without Landlord's prior written consent.

**1.3**      **Appurtenant Rights.** Tenant shall, during the term of this Lease and any renewal, have the appurtenant rights specified in Section 1.3.1 of this Lease, subject to the terms and conditions of this Lease. No other appurtenant rights shall be implied as a part of this Lease. Nothing stated herein shall be construed as to limit in any way the general power and right of Landlord to exercise its governmental powers in any way, including such as may affect the Airport, the Premises, the Common Areas (as hereinafter defined), or any other area under the jurisdiction of Landlord.

1.3.1      Tenant and its invitees shall have the right to use, in common with others, (i) all public Airport facilities and improvements ("Airport Public Facilities") and (ii) such public roads, ways and areas at the Airport as may be necessary for access to and from the Premises, which are now or hereafter provided by Landlord for public use. The Airport Public Facilities and other areas described in the previous sentence are referred to as the

"Common Areas." No aircraft, vehicle, equipment or machinery shall be left in an inoperable condition or stored in the Common Areas by Tenant, its invitees or contractors or suppliers, without the prior written consent of Landlord. Nothing stated in this Lease shall prohibit Landlord from banning from Landlord's property any person or entity which fails to comply with applicable laws, ordinances and rules and regulations, including those adopted by Landlord's directors and those adopted by its Manager, or the Manager's designee.

1.3.2   In addition to any other right granted by law, Landlord, and its Manager, or the Manager's designee, reserve the following specific rights with respect to the Common Areas:

1.3.3   To establish reasonable rules and regulations for the use of the Common Areas:

1.3.4   To use or permit the use of the Common Areas by others to whom Landlord may grant or may have granted such rights in such manner as Landlord may from time-to-time grant;

1.3.5   To close all or any portion of the Common Areas to make repairs or changes, to prevent a dedication of the Common Areas or the accrual of any rights to any person or the public, or to discourage unpermitted use of the Common Areas:

1.3.6   To construct additional buildings and to alter or remove buildings or other improvements in the Common Areas and to change the layout of such Common Areas, including the right to add to or subtract from their shape and size or to change their location;

1.3.7   To exercise any of Landlord's governmental or proprietary powers over the Common Areas.

1.3.8   The right to take any action it considers necessary to protect the aerial approaches of the Airport against obstruction, together with the right to prevent the Tenant from erecting, or permitting to be erected, any building or other structures on the Airport which, in the opinion of Landlord, would limit the usefulness of the Airport or constitute a hazard to aircraft.

1.3.9   The right to develop or improve the Airport as it sees fit, without interference or hindrance on the part of Tenant.

1.3.10 The sole right to determine the level, methods and schedules of any maintenance or improvements at the Airport; and shall have the right to close the Airport whenever Landlord deems it necessary for reasons of public safety or convenience.

1.4   **No Limitation on Landlord's Authority:** Nothing stated herein shall be construed as to limit in any way the general power and right of Landlord to exercise its governmental or proprietary powers in any way, including such as may affect the Airport, the Premises, the Common Areas, or any other area under the jurisdiction of Landlord.

1.5   **Restrictions on Use.** Except as necessary and incidental, use in conjunction with the use authorized for the Premises pursuant to Section 1.2 of this Lease, and without limiting the generality of the restriction on use set forth in Section 1.2 of this Lease, no use may be made of, on, or from the Premises relating to the use, handling, generation, storage, disposal, transportation, or discharge of Hazardous Substances as defined in following Article 6 of this Lease. Under no circumstances shall any use be made of, or conduct occur on, the Premises which would cause the Premises, or any part thereof, or the improvements constructed on the Premises, to be deemed a hazardous waste treatment, storage, or disposal facility requiring a permit, interim status, or any other special authorization under any Environmental Law as defined in Article 6 of this Lease.

1.6   **Access to Premises.** Landlord shall at all times during ordinary business hours have the right to enter upon the Premises and Improvements for the purposes of: (i) inspecting the same; (ii) confirming the performance by Tenant of its obligations under this Lease; (iii) doing any other act which Landlord may be obligated or have the right to perform under this Lease, or reasonably related thereto; and (iv) for any other lawful purpose. Such inspections shall be made only on 24 hour advance notice except in cases of emergency. Such notice shall be sufficient if prominently posted on the primary building for 24 hours prior to the inspection.

## Article 2.  Term

2.1   **Term.** The term of this lease is 30 years, 9 months, commencing October 1, 2004, and continuing through June 30, 2034, unless sooner terminated under the provisions of this Lease.

2.2   **Options to Renew.**

2.2.1   Subject to the terms of this Section 2.2, Tenant shall have the option to renew the term of this Lease for two periods of ten years each.

2.2.2   Tenant may exercise any option to renew the term by giving Landlord written notice of the exercise of the option not later than 180 days before the end of the then-expiring term. The day that is 180 days before the end of the then-expiring terms for which the written notice is given as provided herein shall be the "Exercise Date." If Tenant, in its written

notice to Landlord, desires to exercise an option to renew, Landlord shall, within 30 days of the Exercise Date, provide to Tenant, Landlord's estimated calculation of the next occurring adjustments to Base Rent as provided by Section 3.2 of this Lease. Tenant shall have 30 days after Tenant's receipt of Landlord's calculation of such adjustments to withdraw by written notice to Landlord its exercise of its option to renew. In the case Tenant withdraws its option to renew, Section 2.2.2 of this Lease shall apply.

2.2.3    Failure to exercise any option in the manner and within the period provided in Section 2.2 of this Lease shall extinguish said option and any and all future options. Once exercised or lapsed, an option shall be extinguished.

2.2.4    The terms and conditions of this Lease shall continue unchanged during any renewal of the term hereof, including the rental adjustments provisions set forth in Section 3.2 of this Lease, but not including the options to renew.

2.2.5    Landlord shall not be obligated to accept Tenant's exercise of its option to renew the term of this Lease, if at the end of the then-expiring term of this Lease, (i) an event of default exists under this Lease, or (ii) an event has occurred or failed to occur or a condition exists, which with or without notice or the passage of time, or both, would constitute an event of default under this Lease.

## Article 3.  Rent

3.1    **Rent.** Tenant shall pay to City "Base Rent" as set forth in the following chart, subject to adjustments as provided in Section 3.2 and 3.3 of this Lease, and payable annually as provided in Section 3.4 of this Lease. For the purpose of this Lease, the "Lease Rate" applicable to the premises on the date of this Lease is shown in the following chart opposite the described property.

| Description | Leased Area in Square Feet | Impacted Area in Square Feet | Lease Rate per Square Foot of Impacted Area per Year | Base Rent Annual | Base Rent Monthly |
|---|---|---|---|---|---|
| Land – building site | 243,800 | | $ 0.27 | $65,826 | N/A |
| | | | | | |
| | | | | | |

3.2    **Rent Adjustment.**

3.2.1    The Base Rent established in Section 3.1 and/reestablished in accordance with Section 3.3

shall be increased by 3% every July 1st.   The LANDLORD waives the right to increase
the base rent until July 1, 2009.

3.2.2   Uniform Rental Structure.  In addition to the annual increases provided for in Paragraph
3.2.1, the base rent shall be reestablished on July 1 of every calendar year ending in a zero
or a five to conform with the City's Uniform Rental Structure.  This rate structure shall
be established by the City after consideration of the following factors:

3.2.2.1 The City's costs and needs for operation of the Bend Airport; the fair market
value of the leased premises as defined in 3.3.2; and the demand for ground space at the
Bend Airport.

3.2.2.2 The term "fair market rental value" means the most probable lease rate in terms of
money which the Premises, including only those improvements thereon owned or
extended by Landlord, which would bring if exposed for lease on the open market, with a
reasonable time allowed to find a tenant, leased with full knowledge of the highest and best
use of which the Premises could be put consistent with the then most current City
Airport Master Plan, County Comprehensive Plan and Federal Aviation Administration
("FAA") regulations.

3.4     **Time and Place of Payments/Other Annual Obligations. (a) Initial Rental Period
from October 1, 2004 to June 30, 2006. (1)**At the time that this lease is executed, the
Tenant shall pay a security deposit equal of $16,456.50 (1/4 of annual rental amount).
The security deposit shall be held to secure the Tenant's faithful performance of the
lease.  At the time of lease execution, the tenant will also provide a certificate of insurance
proving compliance with Article 6 of this lease.  The Tenant shall pay no rent for the
period of time from October 1, 2004, until December 31, 2004.  The Tenant's rental
obligation shall begin on January 1, 2005.  The rental obligation for January 1, 2005
through December 31, 2005 shall be owed to the Landlord; however, shall be deferred
pursuant to Paragraph (2) below.

(2) Payment of the Initial year rent shall be deferred until July 1, 2009, unless the
TENANT remains in default of any term of this lease and remains in default for more
than 30 days after written notice of the default has been provided by the LANDLORD in
which event the deferred rent shall be immediately due and payable.  The deferred
payment shall be forgiven by the LANDLORD, if on July 1, 2009, the TENANT is in
compliance with all terms of this Lease and has been in compliance during that five year
period.

(3)Notwithstanding paragraph (2) above, the first payment to the LANDLORD
shall be paid on or before January 1, 2006 which shall be in the amount of $16,456.50

5   —   Standard Airport Ground Lease

(1/4 of the annual rental amount) and the next payment of $16,456.50 shall be due and paid to the LANDLORD on or before April 1, 2006.

(b) **Subsequent Years.** Beginning July 1, 2006, the Tenant shall pay by the 1st of each July Landlord the Base Rent for the subsequent year plus additional amounts to pay for other deficiencies. Rent (as hereinafter defined) shall be delinquent if not paid when due. Payment of Rent shall be made without offset, abatement or deduction, to Landlord at the following address or such other place as Landlord may designate:

> City of Bend
> PO Box 431
> Bend OR 97700

All amounts not paid by Tenant when due shall bear a delinquency charge at the rate of 10 percent per annum, with a one percent minimum charge. The delinquency charge on overdue accounts is subject to periodic change to reflect Landlord's then-current rate charged on overdue accounts. In addition to the annual rent payment, Tenant shall provide proof that property taxes have been paid, a certificate of insurance proving compliance with Article 6 of the Lease, and a current list of subtenants with addresses and telephone numbers. The TENANT may elect to pay the annual rental amount in four equal installments on July 1, October 1, January 1 and April 1 of each year. In the event that one installment is more than ten days late, the entire remaining balance shall become immediately due and payable.

(c) **Use of Security Deposit.** After written notice to the Tenant, the Landlord may pay delinquencies owed by the Tenant relating to Tenant's Lease obligations from the security deposit. After use of such funds by the Landlord, it shall be Tenant's duty to replenish the expended funds so that the original amount of security deposit is maintained. At the conclusion of the lease, any remaining deposit shall be returned to the Tenant or its successor.

(d) The City shall during its study of lease rates and development of a uniform rate structure in 2004 study the present lease provisions pertaining to security deposits. The study of security deposits will include but not be limited to the amount of the security deposit, whether to pay the tenant interest on the security deposit, and other lease measures that will improve the City's assurance of lease compliance and reimbursement of damages upon tenant default. The adopted conclusion of the study will be applied retroactively to existing leases if agreeable to those tenants.

3.5     **Definition of Rent.** All sums other than Base Rent which become payable by Tenant to Landlord pursuant to the terms of this Lease shall be considered Additional Rent due under this Lease. "Rent" shall mean such Additional Rent together with Base Rent.

3.6     **Acceptance of Late Rent.** Landlord shall be entitled, at its sole and complete discretion, to either accept or reject a tender of payment of Rent which is not paid within the time required by Section 7.1.1 of this Lease. In the event Landlord elects to accept a tender of payment of Rent after the time required by Section 7.1.1 of this Lease, Landlord may do so without thereby waiving Tenant's continuing obligation to make such payments when required under the terms of this Lease. Tenant hereby acknowledges that this constitutes a waiver by Tenant of any argument that by accepting a late payment of Rent, Landlord has waived any default which is based upon such late payment or has waived Tenant's continuing obligation to make such payments when and as required by the terms of this Lease.

3.7     **Airport User Charges.** It is expressly understood that Landlord may, from time-to-time, establish various Airport user charges for use made of the facilities located at the Airport. Such user charges shall be payable by the user, including Tenant, of such facilities, in accordance with the rules and regulations, ordinances, or resolutions of Landlord of general application to all users similarly situated and operating, except that as such charges are applied to Tenant without Tenant requesting additional services, these charges shall be comparable in amount and scope as those imposed by other similar General Aviation airports within the state of Oregon.


## Article 4.  Tenant's Obligations

**4.1     Improvements**

4.1.1     Tenant shall obtain all necessary permits before commencement of any construction.

4.1.2.   Tenant shall construct at Tenant's sole expense, the structures or structures suitable for tenant's aviation related manufacturing use of the Premises. These structures shall be in general conformity with the plans submitted to the Landlord and attached hereto as Exhibit D. These structures shall be occupied and in use by the Tenant no later than March 1, 2005.

4.1.2.1     TENANT'S obligations shall also include the construction of all Fire Hydrants required to maintain adequate fire protection for the tenant's development, the design and install of an approved storm drainage system for the tenant's proposed

site, and landscaping to include grass and necessary irrigation improvements; and exterior lighting as required.

4.1.2.2   All improvements shall be built in compliance with the City of Bend Airside Standards for Development ("ASD"), which are incorporated herein by reference, or to FAA specifications for taxiway and ramp improvements, or to Landlord's standards and specifications for utility infrastructure, according to plans and a schedule approved in writing by Landlord. Construction and installation of these improvements shall be completed by September 1, 2005. Tenant shall make no improvements or alterations on the Premises of any kind without the prior written consent of Landlord. The Tenant's site plan to be submitted to Deschutes County for land use approval shall be approved by the Landlord before being submitted to the County.

4.1.2.4   The City shall approve all improvements for compliance with the City of Bend Airside Standards for Development and other applicable rules. The City's approval shall not unreasonably be withheld.

4.2   **Registration of Airplanes and Commercial Pilots.** Any aircraft owned or operated by Tenant shall be registered with the State of Oregon in compliance with ORS 493.030. Tenant shall notify Landlord of any changes to the listing of tail numbers of airplanes stored on the Premises, whether or not operated by Tenant. Such notification shall be provided to Landlord by each July 1 throughout the Lease Term.

4.3   **Compliance with Laws.** Tenant shall use the Airport premises in compliance with all rules and regulations imposed by government.

4.4   **Maintenance.** Tenant shall keep and maintain the Premises and Improvements of any kind, which may be erected, installed or made thereon by Tenant or Landlord, in good and substantial repair and condition, including the exterior condition thereof, and shall make all necessary repairs and alterations thereto as provided in the ASD. Tenant shall provide proper containers for trash and garbage and shall keep the Premises free and clear of rubbish, debris, and litter at all times. Landlord shall at all times during ordinary business hours have the right to enter upon and inspect such Premises. Such inspection shall be made only upon reasonable advance notice by the Landlord, except in the case of emergencies.

4.5   **Utilities.** If available, Tenant shall promptly connect to Landlord's water, waste water and Landlord extended natural gas utilities and pay any charges, including connection

fee/system development charges, for water, waste water, natural gas, electricity, telephone, and all other charges for utilities which may be furnished to the Premises.

4.6     **Liens.** Tenant agrees to pay, when due, all sums of money that may become due for, or purporting to be for, any labor, services, materials, supplies, utilities, furnishings, machinery, or equipment which have been furnished or ordered with Tenant's consent to be furnished to or for Tenant in, upon, or about the Premises herein leased and will cause any lien to be fully discharged and released at the time the performance of any obligation secured by any such lien matures or becomes due. Landlord may require Tenant immediately to procure a bond in the amount of the contested lien.

4.7     **Taxes.** Tenant agrees to pay all lawful taxes and assessments which during the term hereof or any extension may become a lien or which may be levied by the state, county, city or any other tax-levying body upon the Premises or Improvements, or upon any taxable interest of Tenant acquired in this Lease, or any taxable possessory right which Tenant may have in or to the Premises or the Improvements thereon by reason of its occupancy thereof, as well as all taxes on all taxable property, real or personal, owned by Tenant in or about said Premises. Tenant understands that Landlord's property is exempt from property taxation until leased to a taxable entity. In the event that the term of this Lease or any extension thereof ends after June 30 of any year, Tenant shall be responsible for payment of property taxes for the entire tax year without proration, or, in the event of any change in property tax law, for any taxes due under such law. With respect to assessments for public improvements which are or may be payable in Bancroft installments, Tenant shall be required to pay only those installments which become due during the Lease Term.

4.8     **Safety.**

4.8.1   Tenant shall conduct its activities and duties under this Lease in a safe manner, and shall comply with all safety standards imposed by applicable federal, state and local laws and regulations. Tenant shall require the observance of the foregoing by all subcontractors and all other persons transacting business with or from Tenant in any way connected with the conduct of Tenant pursuant to this Lease.

4.8.2   Tenant shall exercise due and reasonable care and caution to prevent and control fire on the Premises and to that end shall provide and maintain such fire suppression and other fire protection equipment as may be required pursuant to applicable governmental laws, rules and regulations for the purpose of protecting the Improvements adequately and restricting the spread of any fire from the Premises to any property adjacent to the Premises.

4.9     Hazardous Substances, Spills and Releases.

4.9.1   Tenant shall immediately notify Landlord upon becoming aware of: (i) any leak, spill, release or disposal of a Hazardous Substance, as defined in Article 6 of this Lease, on, under, or adjacent to the Premises or threat of or reasonable suspicion of any of the same; and/or (ii) any notice or communication from a governmental agency or any other person directed to Tenant or any other person relating to such Hazardous Substances on, under, or adjacent to the Premises or any violation of any federal, state or local laws, regulations or ordinances with respect to the Premises or activities on the Premises.

4.9.2   In the event of a leak, spill, or release of a Hazardous Substance on the Premises or the threat of or reasonable suspicion of the same, Tenant shall immediately undertake all emergency response necessary to contain, clean-up, and remove the Hazardous Substance and shall undertake within a reasonable time all investigatory, remedial and/or removal action necessary or appropriate to ensure that any contamination by the Hazardous Substance is eliminated.  Except in the case of an emergency, Landlord shall have the right to approve all investigatory, remedial, and removal procedures and the company(ies) and/or individual(s) conducting said procedures, but that approval shall not be unreasonably withheld, conditioned or delayed.  Within 30 days following completion of such investigatory, remedial and/or removal action, Tenant shall provide Landlord with a certificate acceptable to Landlord that all such contamination has been eliminated as required by federal, state, or local law or regulations.

4.10    Signage.  Tenant shall have the right to install or cause to be installed appropriate signs on the Premises for purposes of identifying the building, subject to Landlord's written approval, in accordance with the ASD.  A full-sized mounted prototype of an Epic Aircraft will be permitted, if consistent with the ASD.

4.11    Environmental Inspection.

4.11.1  At Tenant's option and at Tenant expense, Tenant may conduct a Level One Environmental Assessment of the Premises, within 60 days of the execution of this Lease, for ascertaining the environmental condition of the Premises.

4.11.2  In addition to any other inspection rights granted herein, Landlord reserves the right to inspect Tenant's management of hazardous substances, as defined in Article 6 of this Lease, on the Premises at any time and from time-to-time with or without notice to

Tenant. If Landlord at any time during the term of this Lease or any extension or renewal thereof has reason to believe that Tenant is managing hazardous substances in a manner that may allow contamination of any portion of the Premises or any other property, Landlord may require Tenant to furnish to Landlord, at Tenant's sole expense, an environmental audit or an environmental assessment with respect to the matters of concern to Landlord. Landlord shall have the right to approve the company or individual conducting said audit and the audit procedures and shall be given an original copy of the results. If said audit or assessment results demonstrate that Tenant was in compliance with regulatory standards for the management of hazardous substances, as defined in Article 6 of this Lease, and audit or assessment demonstrate that there is not any contamination, Landlord shall reimburse Tenant for the amount Tenant paid for audit or assessment. Landlord shall have the right to request and receive information with respect to use of the hazardous substances on the Premises in writing from any subtenants and other occupants of the Premises. Tenant shall cooperate with all such requests.

4.12    **Specific Terms and Conditions.** Terms and conditions that are specific to this Lease are attached as Attachment D hereto.


## Article 5.  Landlord Obligations and Warranties

5.1    **Landlord's Warranties** Landlord warrants that it is the owner of the Premises and has the right to lease said Premises under the terms hereof. Subject to encumbrances of record, and subject to Tenant complying with the terms and conditions hereof, the Landlord will defend Tenant's right to quiet enjoyment of the Premises from the lawful claims of all persons during the Lease Term.

5.2    **Landlord's Maintenance Responsibility.** Landlord shall not have any responsibility for repair or maintenance of the Premises. Landlord shall have the right to remedy, at Landlord's option the findings of the Level One Environmental Assessment should Tenant perform such assessment as provided in Section 4.11.1 of this Lease. If Landlord does not remedy within 60 days of assessment report, Tenant shall within 60 days of notification by Landlord that it will not remedy either do so at Tenant expense or accept Premises "as is". If Landlord or Tenant remedy findings of assessment report or Tenant accepts Premises "as is" Landlord shall have no further environmental maintenance obligation for the Premises, except for the findings noted in the Level One Environmental Assessment, as a result of this Lease.

5.3    **Condition of Premises.** Landlord makes no warranties or representations regarding the Premises, including, without limitation, the suitability of the Premises for Tenant's

intended purpose, whether or not known to Landlord, or the condition, zoning or square footage of the Premises. Tenant has inspected and accepts the Premises in an "as is" condition upon taking possession, and Landlord shall have no liability to Tenant for any damage or injury caused by the condition of the Premises.

5.4     **Utilities.** Landlord will provide water and wastewater service to the Premises pursuant to the terms and conditions of applicable City laws, regulations and policy.

## Article 6.  Liability, Indemnity, Insurance, and Damage and Destruction

6.1     **Indemnification.** Tenant shall indemnify, hold harmless and defend City from any claim, loss or liability and against all Costs which, in whole or in part, arise out of or related to any activity of Tenant on the Premises in the possession or under the control of Tenant including any such claim, loss or liability which may be caused or contributed to in whole or in part by City's own negligence or failure to effect any repair or maintenance required by this Lease.

6.1.1   As used in Section 6.1 of this Lease, "Costs" shall include, but not be limited to: (i) all claims of third parties, including governmental agencies, for damages, response costs, or other relief; (ii) the cost, expense or loss to City of any injunctive relief, including preliminary or temporary injunctive relief, applicable to City or the Premises; (iii) all expenses of evaluation, testing, analysis relating to Hazardous Substances, including fees of attorneys, engineers, consultants, paralegals and experts; (iv) all expenses of reporting the existence of Hazardous Substances to any agency of the State of Oregon or the United States as required by applicable Environmental Laws; (v) and any and all expenses or obligations, including attorneys' and paralegal fees, incurred at, before, and after any trial or appeal therefrom or any administrative proceeding or appeal therefrom whether or not taxable as costs, including, without limitation, attorneys' and paralegal fees, witness fees (expert and otherwise), deposition costs, copying and telephone charges and other expenses; and, (vi) any damages, costs, liabilities and expenses which are claimed to be owed by any federal or state regulating and administering agency.

6.1.2   "Hazardous Substances" shall be interpreted in the broadest sense to include any substances, materials, wastes, pollutants, or contaminants that, because of their quantity, concentration, or physical, chemical, or infectious characteristics, may cause or threaten a present or potential hazard to human health or the environment when improperly generated, used, stored, handled, treated, discharged, disposed of, or leaked. "Hazardous Substances" shall include, but not be limited to, any and all substances, materials, wastes,

pollutants, or contaminants, defined or designed as hazardous, toxic, radioactive, dangerous, or any other similar term in or under any of the Environmental Laws, and shall specifically include asbestos and asbestos-containing materials, petroleum or petroleum products, including crude oil or any fraction thereof, and urea formaldehyde. As used herein, "Environmental Laws" shall be interpreted in the broadest sense to include any and all federal, state, and local statutes, regulations, rules, and ordinances now or hereafter in effect, as may be amended from time-to-time, governing Hazardous Substances or relating to the protection of human health or the environment including, but not limited to, the Resource Conservation and Recovery Act (RCRA) (42 U.S.C. §6901, *et seq.*); the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) (42 U.S.C. §9601, *et seq.*); the Federal Water Pollution Control Act/Clean Water Act (33 U.S.C. §1257, *et seq.*); the Toxic Substances Control Act (15 U.S.C. §2601, *et seq*); Superfund Amendment and Reauthorization Act of 1986 (SAREA) (P.L. 99-499, October 17, 1986); the Safe Drinking Water Act (42 U.S.C. §300, *et seq.*); the Solid Waste Disposal Act (42 U.S.C. §3251, *et seq.*); the Clean Water Act (33 U.S.C. §1251, *et seq.*); The Clean Air Act (42 U.S.C. §7401, *et seq.*); the Formal Fungicide and Rodenticide Act/Pesticide Act (7 U.S.C. §12, *et seq.*); the Oregon Revised Statutes Relating to community information on hazardous waste reduction (ORS 465.003, *et seq.*); toxic use reduction and hazardous waste reduction (ORS 465.003, *et seq.*); treatment, storage and disposal of hazardous waste and PCBs (ORS 466.005, *et seq.*); underground storage tanks (ORS 466.706, *et seq.*); penalties for noncompliance (ORS 468B.300, *et seq.*) Ground water (ORS 466.706, *et seq.*); oil or hazardous material spillage (ORS 468.875, *et seq.*); asbestos abatement projects (ORS 468A.700, *et seq.*); water pollution control (ORS 468.691, et seq.); oil spills (ORS 468.780, *et seq.*); asbestos abatement (ORS 468.875, *et seq.*); any similar or equivalent laws; and any implementing laws, regulations, rules and ordinances.

6.1.3   "Tenant" shall be interpreted to mean Tenant, and Tenant's employees, agents, representatives, invitees, or anyone acting on Tenant's behalf.

6.1.4   Promptly upon written notice from City or from any governmental entity with jurisdiction, Tenant shall remove from the Premises (including without limitation the soil or water table thereof), at its own cost and expense, all Hazardous Substances for which Tenant is liable under the terms of this Lease and shall restore the Premises to clean, safe, good and serviceable condition. Any such cleanup shall be in conformance with all applicable governmental rules and regulations. Any costs incurred by or assessed against City shall be paid by Tenant promptly after City incurs the obligation to pay such amounts or determines that an assessment is duly owing and so notifies Tenant. As used in this paragraph, "Premises" shall be deemed to include the soil and water table thereof.

6.2     **Tenant to Defend City.** Tenant shall, at its sole expense, defend any and all actions, suits, and proceedings relating to matters covered by the indemnity set forth in Section 6.1 of this Lease, which may be brought against City or in which City may be impleaded, and shall satisfy, pay, and discharge any and all judgments, orders, and decrees that may be entered against City in any such action or proceeding, to the extent Tenant is found or determined to be liable under the terms of this Lease.

6.3     **Nonliability of City.** City shall not be liable for any injury or damage to any property or to any person happening on, in, or about the Premises, or structures or improvements on the Premises. This nonliability of City shall include, but not be limited to, or injury or damage to any property or persons which may be caused by the acts or omissions of other Airport tenants of City, or members of the public who are using the Airport.

6.4     **Insurance.**

6.4.1   Tenant shall keep all of Tenant's property, including but not limited to structures and improvements installed by Tenant on the Premises continuously insured with an insurance underwriter(s) satisfactory, with a Best's rating of "A" or better, to City and authorized to do business in the State of Oregon. The policy(ies) shall be written on special form and shall be on a replacement cost basis to the full insurable value of the Tenant's property on the Premises.

6.4.2   Tenant shall obtain and continue in good standing during the term of this Lease an occurrence form liability insurance policy or policies, including but not limited to [1][airport premises, aircraft, commercial general, automobile, and hangar keepers legal liability insurance (including coverage for aircraft or other property of others in the care, custody, or control of Tenant)] for the protection of Tenant and City, its directors, officers, agents, and employees, insuring Tenant and City against liability for damages because of personal injury, bodily injury, death, or damage to property, including loss of use thereof, and all risks arising directly or indirectly out of Tenant's activities on, or any condition occurring on, or in any way related to the Premises or occasioned by reason of the operations of Tenant with insurance of not less than [2][$1,000,0000 combined single limit automobile liability coverage and] $1,000,000 bodily injury limit and property damage limit of $1,000,000 for premises [3][and products/completed operations] and aircraft liability, or the City's statutory tort liability limits if these limits are more than

---

1 airport premises and aircraft liability insurance required for all leases; commercial general, auto liability, and/or hangarkeeper's liability insurance required specific to nature of lessee operations.
2 applicable if auto liability insurance required per lessee's use of premises
3 applicable if lessee's use of premises involves manufacturing/industrial operations

14 — Standard Airport Ground Lease

the above specified amounts [4] [. and not less than $250,000 hangar keepers liability limit for each aircraft or $500,000 for each loss]. Such insurance shall name City, it's directors, officers, agents, and employees as additional insureds with the stipulation that this insurance, as to the interest of City only therein, shall not be invalidated by any act or neglect or breach of contract by Tenant. Such insurance will be primary and will not require any contribution from any insurance or self-insurance carried by City.

6.4.3    Tenant shall maintain in force Workers Compensation insurance, including coverage for Employer's Liability.

6.4.4    For each policy of insurance. Tenant shall furnish to City an acceptable certificate evidencing the date, amount, and type of insurance that has been procured pursuant to this Lease. All policies of insurance shall provide for not less than thirty days' written notice to the City and Tenant before such policies may be revised, nonrenewed, or canceled. Upon request, Tenant shall provide City with a copy or copies of any insurance policy provided pursuant to this Lease. The policy period for such insurance shall be extended, if necessary, to provide that its renewal commences as of July 1 of each year of the term of this Lease.

6.4.5    City shall have the right to review the types and limits of insurance required herein. In the event City determines that such types or limits should be added, modified, increased or lowered, City will provide notice to Tenant of such determination and Tenant shall modify its coverage to comply with the new requirements and provide City with an updated certificate. Such additions, modifications or increases shall be limited to those that are typical and or standard within the general aviation industry or the Central Oregon region and or required by applicable federal, state, or local government laws, rules, or regulations.

6.5    **Damage and Destruction.** If the structures or other improvements on the Premises are damaged or destroyed and the damage and destruction is 50 percent or less of their replacement cost. Tenant shall either promptly do whatever is necessary to repair, rebuild or restore the structures and other improvements to the condition required by this Lease; or promptly remove whatever is left of the structures and other improvements, and all debris, and shall restore the Premises to the condition required by this Lease and pay Landlord two years of Base Rent at the then current Base Rent. If the structures or other improvements on the Premises are damaged or destroyed and the damage and destruction is more than 50 percent of their replacement cost. Tenant shall either promptly do whatever is necessary to repair, rebuild or restore the structures and other improvements on the Premises to the

---

[4] applicable if lessee's use of premises involves keeping aircraft/property of others in operation of business

15 — Standard Airport Ground Lease

condition required by this Lease or promptly remove whatever is left of the structures and other improvements, and all debris and shall restore the Premises to the condition required by this Lease and, if the damage and destruction occurs prior to the expiration date of the original lease term, pay Landlord one year of Base Rent at the then current Base Rent. Any insurance proceeds shall be used to repair, rebuild or restore the structures and other improvements and restore the Premises or to remove the structures and or other improvements and restore the Premises to the condition required by this Lease. The remainder of any insurance proceeds shall belong to Tenant.

6.6    **Fire and Other Casualty Protection.** Protection against loss by fire or other casualty to the contents of the Premises shall not at any time be an obligation of City

6.7    **Waiver of Subrogation.** Neither party shall be liable to the other (or to the other's successors or assigns) for any loss or damage caused by fire or any of the risks enumerated in a standard fire insurance policy with an extended coverage endorsement, and in the event of insured loss, neither party's insurance company shall have a subrogated claim against the other. This waiver shall be valid only if the insurance policy in question expressly permits waiver of subrogation or if the insurance company agrees in writing that such a waiver will not affect coverage under the policies. Each party agrees to use best efforts to obtain such an agreement from its insurer if the policy does not expressly permit a waiver of subrogation.


# Article 7.   Default

7.1    **Events of Default.**   The following shall be events of default:

7.1.1    *Default in Rent:* Failure of Tenant to pay any Rent due Landlord or other amount due under this Lease within ten days after it is due. Tenant's liability to Landlord for default shall survive termination of this Lease.

7.1.2    *Default in Other Covenants:* Failure of Tenant to comply with any term or condition or fulfill any obligation of this Lease (other than the payment of Rent or other amounts due under this Lease) within 30 days after written notice by Landlord specifying the nature of the default with reasonable particularity. If the default is of such a nature that it cannot be completely remedied within the 30-day period, this provision shall be complied with if Tenant makes a substantial effort towards correction of the default within the 30-day

16  —  Standard Airport Ground Lease

period and thereafter proceeds with reasonable diligence and in good faith to effect the remedy as soon as practical.

7.1.3 *Insolvency:* Insolvency of Tenant; an assignment by Tenant for the benefit of creditors; the filing by Tenant of a voluntary petition in bankruptcy; an adjudication that Tenant is bankrupt or the appointment of a receiver of the properties of Tenant and the receiver is not discharged within 30 days; the filing of an involuntary petition of bankruptcy and failure of Tenant to secure a dismissal of the petition within 30 days after filing; attachment of or the levying of execution on the leasehold interest and failure of Tenant to secure discharge of the attachment or release of the levy of execution within ten days.

7.1.4 *Abandonment:* Failure of Tenant for 30 days or more to occupy the Premises for one or more of the purposes permitted under this Lease unless such failure is excused under other provisions of this Lease.

7.1.5 *Default in Development.* Failure of Tenant to develop the Premises pursuant to final plan approval of Tenant's site plan, approved in accordance with the City's ASD, including: failure to proceed with the proposed development of the Premises in the manner depicted and within the time frame represented by the final approved site plan; and, failure to furnish Landlord with a certificate of occupancy as required by the ASD prior to expiration of the site plan approval.

7.2     Remedies on Default.

7.2.1 In the event of default under this Lease, Landlord may terminate the Lease without notice and at any time may exercise any other remedies available under law or equity for such default. In the event that the Landlord elects to provide notice of termination, such notice to terminate may be given before or within the grace period for default and may be included in a notice of failure of compliance, and such notice shall be affixed to the leased premises and mailed by registered mail to the address contained in this Lease or other address provided by the tenant in writing to the Landlord.

7.2.2 Suit(s) or action(s) for the recovery of the rents and other amounts and damages, or for the recovery of possession may be brought by Landlord, from time-to-time, at Landlord's election, and nothing in this Lease will be deemed to require Landlord to await the date on which the Lease Term expires. In the event the rental paid under this Lease is based upon percentage rent, the rent owed to Landlord for the remainder of the Lease Term shall be the average annual rent paid over the previous four years multiplied by the number of remaining lease years. Each right and remedy in this Lease will be cumulative and will be in addition to every other right or remedy in this Lease or existing at law or in equity or

by statute or otherwise, including, without limitation, suits for injunctive relief and specific performance. The exercise or beginning of the exercise by Landlord of any such rights or remedies will not preclude the simultaneous or later exercise by Landlord of any other such rights or remedies. All such rights and remedies are nonexclusive.

## Article 8. Termination

8.1     **Ownership of Structures and Improvements.** The structures and improvements constructed and installed by Tenant on the Premises shall remain the property of Tenant until the termination of this Lease. Upon termination of this Lease, whether at the expiration of the term or earlier in the event of default, Landlord may require Tenant to either: (i) remove the structures, including all fixtures and the like attached thereto, and any other improvements installed by Tenant, within 60 days after termination, at Tenant expense; or (ii) leave the structures on the Premises if Landlord consents. If Landlord directs Tenant to remove the structures, then Tenant shall, in addition to removing the structures, perform whatever repairs or restoration that are necessary to leave the Premises, including but not limited to paving and improvements other than the structures, in good condition satisfactory to Landlord. If Landlord directsTenant to leave the structures and Landlord consents to accept them, then the structures and improvements shall become the property of Landlord.

8.2     **Condition of Premises.** Upon expiration of the lease term or earlier termination on account of default, Tenant shall return the Premises to Landlord in good condition.

8.3     **Holding Over.** If Tenant shall hold over after the expiration or termination of this Lease Term or any extension thereof, and shall not have agreed in writing with Landlord upon the terms and provisions of a new lease prior to such expiration, at Landlord's discretion, Tenant shall be deemed a month-to-month holdover tenant or a tenant at sufferance. In the event Landlord deems Tenant as a month-to-month holdover tenant, Tenant shall remain bound by all terms, covenants, and agreements hereof, except that: (i) the tenancy shall be one from month-to-month subject to all payment of all rent in advance, the monthly rent being 120 percent of the rent that otherwise would be charged comparable tenants at the time of holding over; (ii) title to improvements shall have vested in Landlord pursuant to Section 7.4 of this Lease; (iii) Landlord shall have the right to adjust the rental payments, charges or use fees upon 30 days' written notice to Tenant; and (iv) such month-to-month tenancy may be terminated at any time by written notice from Landlord to Tenant. In the event Landlord deems Tenant as a tenant at sufferance, Landlord shall be entitled to exercise any rights pursuant thereto. In the event of holdover beyond June 30 of any year, Tenant shall be responsible for payment of property taxes respecting the Premises for the entire tax year without proration.

8.4    Upon termination of the Lease, the Tenant's leases with subtenants shall immediately terminate. In such event, the Tenant consents to and permits the Landlord to contact the Tenant's subtenants for the purpose of the Landlord entering into agreements to lease the premises to Subtenants and collect rental payments from the Subtenants prior to the execution of lease and thereafter.

## Article 9.  General Provisions

9.1    **Assignment, Encumbrancing and Subletting.** Tenant shall not assign, transfer, pledge, surrender or otherwise encumber, convey or dispose of this Lease or any interest in any portion of the same by operation of law or otherwise (collectively "transfer"), or permit any other person or persons, entity, company or corporation to occupy all or any portion of the Premises, without the prior written consent of the Landlord in each instance. Any such attempt at transfer shall be void and shall be a default by Tenant under this Lease. Any transfer or cumulative transfer over the term of this Lease of majority of the voting stock of Tenant including any change in the shares of voting stock outstanding and issued, except in proportion to current ownership percentages, shall be deemed a transfer requiring the Landlord's prior consent. Notwithstanding the above provision, the Tenant, provided that it is not in default of any term of this lease, may sublease the subject premises with the approval of the Landlord; however the Tenant shall be responsible for payment of the current Market Rent at the airport to be determined by the Landlord.

9.1.1    No consent in one instance shall prevent this provision from applying to a subsequent instance. Landlord shall consent to a transaction conveyed by this provision when withholding such consent would be unreasonable.

9.1.2    The failure by Tenant to obtain the written consent of the Landlord before entering into a transaction covered by Paragraph 9.1 shall constitute a material breach of this Lease and shall be an "Event of Default."

9.2    **Condemnation.** Either party receiving any notice of intended taking, any service or legal process relating to condemnation or any other notification in connection with any taking, condemnation or purchase, sale or transfer in lieu of condemnation shall promptly give the other party notice of such receipt. Landlord, Tenant and any leasehold mortgagee shall have the right to represent its respective interest in each proceeding or negotiation to make full proof of its claims. No sale, transfer, agreement or settlement with the condemning authority shall be made without the consent of Landlord and Tenant. For purposes of this Lease, taking or condemnation includes a sale to a purchaser with the power of eminent domain in the face of a threat or the probability of the exercise of the

power. If a condemning authority takes all of the Premises, or a portion sufficient to render the remaining Premises reasonably unsuitable for the use that Tenant was then making of the Premises, this lease shall terminate as of the date that title vests in the condemning authority.

9.3     **Nonwaiver.** Waiver by either party of strict performance of any provision of this Lease shall not be a waiver of or prejudice the party's right to require strict performance of the same provision in the future or of any other provision.

9.4     **Law of Oregon.** The laws of the State of Oregon shall govern this Lease.

9.5     **Adherence to Law.** Tenant shall adhere to all applicable federal, state, and local laws, rules, regulations, and ordinances, including laws governing its relationship with its employees, including but not limited to laws, rules regulations and policies concerning Workers Compensation, and minimum and prevailing wage requirements.

9.6     **Time of Essence.** It is mutually agreed that time is of the essence in the performance of all covenants and conditions to be kept and performed under the terms of this Lease.

9.7     **Warranties/Guarantees.** Landlord makes no warranty, guarantee, or averment of any nature whatsoever concerning the physical condition of the Premises, and it is agreed that Landlord will not be responsible for any loss, damage or costs which may be incurred by Tenant by reason of any such physical condition.

9.8     **Headings.** The article and subarticle headings contained herein are for convenience in reference and are not included to define or limit the scope of any provisions of this Lease.

9.9     **Consent of Landlord.** Whenever consent, approval or direction by Landlord is required under the terms contained herein, all such consent, approval or direction shall be received in writing from Landlord.

9.10    **Notices.** All notices required under this Lease shall be deemed to be properly served if sent by certified mail to the last address previously furnished by the parties hereto. Until thereafter changed by the parties by notice in writing, notice shall be sent to:

        Landlord:     City of Bend
                      Attn: Airport Manager
                      PO Box 431
                      Bend, Oregon 97709-0431
                      541-388-5505

Tenant:   AIRCRAFT INVESTOR RESOURCES, LLC
          2121 Redberd Drive
          Las Vegas, NV  89134.
          Telephone No.  702-233-2552

The date of service of such notice is the date such notice is deposited in a post office of the United States Post Office Department, postage prepaid. For the purpose of inspection of premises, notice shall be complete upon posting of the premises, provided the Landlord has attempted to notify the Tenant using the above telephone number provided by Tenant.  Tenant Quick-Turn Technologies, LLC, designates Tenant Aircraft Investor Resources, LLC to be its agent for receipt of all notices provided for in this Lease and that service of such notice shall be complete upon Quick-Turn Technologies LLC upon the mailing of notice to the above address for Aircraft Investor Resources, LLC.

9.12   **Modification.**  Any modification of this Lease shall be in writing and signed by both parties.

9.13   **Aviation Easement.**

9.13.1 Tenant's right to use property for the purposes as set forth in this Lease shall be secondary to and subordinate to the operation of the Airport. Landlord specifically reserves for itself, and for the public, a right of flight for the passage of aircraft in the airspace above the surface of the described property together with the right to cause said airspace such noise as may be inherent in the present or future operation of aircraft.

9.13.2 By executing this Lease, Tenant agrees that it will not construct any building or facility at a height in feet above the ground or take any other action that, in the opinion of Landlord, will interfere with the navigational aids of flight operations of the Airport.

9.14   **Security.** Tenant recognizes its obligations to comply with Federal Airport Security Regulations. Tenant will reimburse Landlord in full for any fines or penalties levied against Landlord for security violations as a result of any actions on the part of Tenant, its agents, suppliers, guests, customers or employees or any violation occurring at any field access point under the control of Tenant.

9.15   **Noise Abatement.** Landlord and Tenant recognize the importance and joint responsibility of compatibility between the Airport and the surrounding community. Therefore, Tenant agrees to actively participate with Landlord in developing and implementing mutually acceptable noise abatement procedures, policies and programs.

9.16    **Sponsor's Assurance Subordination.** This Lease shall be subordinate to the provisions of any existing or future agreement between Landlord and the United States relative to the operation or maintenance of the Airport, the execution of which has been or may be required as a condition precedent to the expenditure of federal funds for the development of the Airport.

9.17    **Nondiscrimination.** Tenant assures that it will undertake an affirmative action program as required by 14 CFR Part 152, Subpart E, and 49 CFR Part 21, to ensure that no person shall, on the grounds of race, creed, color, national origin, or sex be excluded from: (i) participating in any employment activities covered in 14 CFR Part 152, Subpart E; or (ii) the use of the Premises or delivery of services. Tenant assures that no person shall be excluded on these grounds from activity covered by this Subpart and 49 CFR Part 21. Tenant assures that it will require that its covered suborganizations provide assurances to Tenant that they similarly will undertake affirmative action programs and that they will require assurances from their suborganizations, as required by 14 CFR Part 152, Subpart E and 49 CFR Part 21, to the same effect.

9.18    **Rules and Regulations.** Without limiting the generality of Article 9.5 of this Lease, Tenant and Tenant's officer's, employees, invites, agents and contractors shall comply with reasonable rules and regulations adopted by Landlord, or it's Manager, or the Manager's designee, with respect to the use of, entry on, access to, or possession of Landlord's property at the Airport or contiguous property owned by Landlord, as the same may change from time-to-time. Copies of current rules and regulations may be obtained during normal office hours at City Hall.

9.19    **No Benefit to Third Parties.** Landlord and Tenant are the only parties to this Lease and as such are the only parties entitled to enforce its terms. Nothing in this Lease gives or shall be construed to give or provide any benefit, direct, indirect or otherwise to third parties unless third persons are expressly described as intended to be beneficiaries of its terms.

9.20    **Entire Agreement.** It is understood and agreed that this transaction contains the entire agreement between the parties hereto with respect to the lease of the Premises and the operation thereon of a fixed base operation. It is further understood and agreed by Tenant that Landlord and Landlord's agents have made no representations or promises with respect to this Lease or the making or entry into this Lease, except as in this Lease expressly set forth, and that no claim or liability or cause for termination shall be asserted by Tenant against Landlord for, and Landlord shall not be liable by reason of, the breach of any representations or promises not expressly stated in this Lease, any other written or oral agreement with Landlord being expressly waived by Tenant.

9.21    **Authority.** The individuals executing this Lease warrant that they have full authority to execute this Lease on behalf of the entity for whom they are acting herein.

9.22.1  **This lease must be approved by the City Council of Bend and is not effective to confer any rights upon the Tenant until the City Council approves the lease. Any work performed by the Tenant on the premises before approval by City Council is performed at the risk of the Tenant and is not authorized by the City of Bend.**

10.0.0  The premises have not yet been surveyed. The Tenant shall be responsible for the costs of surveying the rental premises.

11.0    Landlord is not by virtue of this Lease a partner or joint venturer with Tenant in connection with the business carried on under this lease and shall have no obligation with respect to Tenant's debts or other liabilities and no interest in Tenant's profits.

The parties hereto further acknowledge that they have thoroughly read this Lease, including any exhibits or attachments hereto, and have sought and received whatever competent advice and counsel was necessary for them to form a full and complete understanding of all rights and obligations herein; and, having so done, do hereby execute this Lease effective as of the day and year first above mentioned.

Tenant:                          Landlord:
Quick-Turn Technologies, LLC     City of Bend

By:_____        By:_____
   President/Chairman                City Manager

Attest:_____         Attest:_____
       Secretary

Date:_____          Date:_____


Tenant:
Aircraft Investor Resources, LLC

By:_____
   President/Chairman

Attest: _____
Secretary

Date: Oct 2, 2009

Schedule of Referenced Documents

| Location | Description |
|---|---|
| Attachment A | Description and/or Map of Premises |
| Incorp. By Reference | City of Bend General Aviation Minimum Standards |
| Incorp. By Reference | City of Bend Airside Standards for Development |
| Attachment B | Sketch of 24 Acre (+/-) Property Subject to 5-year option |
| Attachment C | Site Plan For Improvements |
| Attachment D | Specific Terms and Conditions |

24 — Standard Airport Ground Lease

ATTACHMENT D

SPECIFIC TERMS AND CONDITIONS OF THIS LEASE

1. Within 90 days of the execution of this lease, the Tenant shall have obtained land use approval and applied for a building permit to construct the manufacturing structures on the leased premises. The structures shall be completed and occupied by March 1, 2005 by the TENANT.

2. The TENANT shall provide to the LANDLORD within seven (7) days of the execution of this Lease, financial records that establish the TENANT's ability to successfully perform its obligations under this Lease. In the event that TENANT fails to provide such records to the satisfaction of the LANDLORD or if the documents fail to positively establish the TENANT has the present ability to successfully perform, the LANDLORD may cancel this Lease within thirty days of its execution.

3. OPTION TO LEASE ADDITIONAL LAND. In addition to the option described in Paragraph 2, the TENANT shall for a duration of five years have the option the lease additional portions or all of the 24 acre parcel described in Attachment C of this lease for the expansion of the TENANT'S airplane manufacturing business and/or for the establishment of a university dedicated to training individuals in airplane manufacturing.

   (a) TENANT may exercise this option if it has been and continues to be in compliance with the terms of the lease including the job creation requirements of the LANDLORD's loan and grant from the State of Oregon, Oregon Economic Development Department.

   (b) The TENANT shall be entitled to pay rent for the exercised parcels at the rate of 50 percent of the then market rate. For the first five years of such tenancy, the rental rate will not be subject to annual adjustments, however, shall be subject to the five year market adjustments. For years subsequent to the initial five year term, leases for the exercised parcels shall be subject to annual 3 % and five year market rate adjustments.

4. JOB CREATION REQUIREMENTS. The TENANT shall no later than October 1, 2009, shall have established 240 family wage jobs and shall retain those positions for the time required by the LANDLORD's agreement with the State of Oregon. In

addition, the TENANT shall fully cooperate with the LANDLORD in providing
information to the LANDLORD to enable the LANDLORD to meet any and all
reporting requirements related to the State funding.

5.  LEASE CONTINGENCY. This Lease shall be contingent upon the LANDLORD
    obtaining a satisfactory financial package from the State of Oregon with which to
    construct the infrastructure on the east side of the airport. Unless exercised by the
    LANDLORD prior to November 15, 2004, this contingency shall lapse and expire.

6.  The LANDLORD shall construct a taxi-way from the airport runway to the subject
    premises at its expense at the location specified in Exhibit C. The TENANT may
    relocate the taxi-way at its own expense provided the location and specifications of
    the taxi-way have been approved by the LANDLORD.

7.  The LANDLORD shall not charge water or sewer connection fees for the
    improvements to be constructed in 2004 to 2005.

8.  The LANDLORD shall by January 1, 2005 have completed the necessary street,
    water and sewer infrastructure to serve the leased premises. In the event that the
    infrastructure is not completed by that date, and the tenant is prepared to connect to
    the infrastructure for needed services, the tenant's rental obligation shall not begin
    until LANDLORD'S infrastructure is completed.



ATTACHMENT A





ATTACHMENT C

BOTTOM LEVEL

OFFICES / MATERIAL STORAGE

OVEN

PAINT

177'—00"
70'—00"
210'—00"
70'—03"
70'—00"
520'
567'



FRONT

360'-.00"



RIGHT SIDE

310'-.00"



LEFT SIDE

30' - .00"

210' - .00"





# Attachment E
## To
## Standard Airport Ground Lease
## By and Between
## City of Bend, an Oregon Municipal Corporation ("Landlord")
## And
## QUICK-TURN TECNOLOGIES, LLC AND
## AIRCRAFT INVESTOR RESOURCES, LLC ("Tenant")

## Improvement Lease Approval and Lease Modifications

(1) Landlord hereby consents to the Improvement Lease dated January 17, 2005 between Tenant and ER 1, a Delaware limited liability company ("Sub lessee") (Exhibit 1 to Attachment E). The City's consent does not in any way serve to amend the terms of the Ground Lease, and Tenant, their successors, assigns, subtenants, owners of condominium interests shall be subject to the terms of the Ground Lease.

(2) Use of Premises: Subject to the requirements of Paragraph 5, below, in addition to the uses described in the Lease Section 1.2 Use of Premises, Tenant may also use the premises for construction, operation and maintenance of hangars for sub sub lease and potentially condominium aircraft hangars for sale to aircraft owners on the premises (Condominium Units) or any such other permitted airport use. All such sub sub leases and/or unit sales shall be subject to the terms and conditions of this Attachment E and the Ground Lease and all attachments, exhibits and amendments thereto.

If the premises are converted to Condominiums, said conversion shall be in compliance with Oregon Revised Statutes Chapter 100 Condominiums (Exhibit 2 to Attachment E incorporated by reference), also known as the Oregon Condominium Act ORS 100.010, and all other laws, rules and regulations affecting condominiums by governmental agencies having jurisdiction.

Declarant, whomever that may be, including not limited to the Tenant or Sub lessee shall pay all legal fees, costs and fees whatsoever incurred by Landlord associated with a conversion to condominiums.

Any condominium hangar owner, or association thereof will agree to the following terms and conditions, in addition to any provisions of ORS Chapter 100 Condominiums and the bi-laws of the condominium association and any other rules governing ownership of a condominium terms and conditions of the Lease and all other attachments, exhibits and amendments thereto.

Any sub sub lessee (Sub lessee to ER 1) or association thereof will agree to the following terms and conditions and adhere to the terms and conditions of the Lease and any all other attachments, exhibits and amendments thereto.

In the event the Tenant ceases to be a party to this Agreement and perform its obligations hereunder to Landlord, other than by transfer of interest approved in writing by the Landlord, the Sub lessee, ER 1, will recognize the Landlord as the successor to the Tenant and will attorn to, and render performance to Landlord as if Landlord were the original Sub lessor under such sublease.

In the event the Sub lessee (ER 1) ceases to be a party to this Agreement and perform its obligations hereunder to Landlord, other than by transfer of interest approved in writing by the Landlord, the sub sub lessees and/or condominium owners and/or associations thereof will recognize the Landlord as the successor to the sub lessor and will attorn to, and render performance to Landlord as if Landlord were the original Sub lessor under such subleases or condominium ownership.

Every condominium owner and/or sub sub lessee of a portion of the demised premises pursuant to a sub sub lease or condominium association hereafter authorized, executed and delivered by Tenant or Sub lessee will provide in any such sub sub lease or in a condominium association agreement that:

Condominium hangar owners and/or sub sub lessees will be liable to Landlord for their prorata share of the rent required to be paid to the City of Bend pursuant to the Ground Lease, in addition to payments that are required by agreements, subleases for particular/individual rental/condominium units. Such prorata share will be determined by dividing the square feet of each condominium ownership and/or sub sub lessees premises by the total square feet of the premises in the Lease subject to rental, whereby the premises of the condominium owner or of the sub sub lessee premises is the numerator and the total premises leased under the Lease is the denominator and applying the ratio obtained to the total rentals required to be paid to the Landlord. Payment of rent under this paragraph will entitle the condominium owners and/or sub sub lessees to quiet enjoyment of the premises.

(3) It is understood and agreed that the Tenant shall secure fuel for owners or any association of owners as their agent. Any delivery of fuel shall be in compliance with all governmental laws, rules and regulations having jurisdiction over fuel distribution upon the premises.

(4) Article 3. Rent of the Standard Airport Ground Lease is further amended to reflect the increase in square footage leased and corresponding rent as follows:

A. Clause 3.1: The following areas of the chart are modified as follows:

| Leased Area in Square Feet | Base Rent Annual |
|---|---|
| 232.680 | $62,823.60 |

B. Clause 3.4: The amount of ¼ of annual rental amount equal to $16,456.50 as stated in subparagraph (1), (3), shall be changed to $15,705.90.

(5) Tenant shall give the City 30 days notice of its intent to use the building for any of the permitted uses contained herein, ("Alternate Uses"). During this 30 day notice period, ("Option Period") the City may either purchase the building from ER 1 at an agreed upon price or provide a replacement tenant upon terms and conditions acceptable to ER 1. If neither option is exercised by the City, Tenant may proceed with Alternate Uses as provided herein without further notice.

The terms and conditions of this Attachment E are hereby agreed to and accepted by the parties on the dates shown under the signatures below, the last date shown shall be the effective date of this agreement.

Landlord:
City of Bend

By: _____

Title: _City Manager_____

Attest: _____
~~Secretary~~ Deputy City Recorder
Date: _3|31|05_____

Sub Lessee:
ER 1, a Delaware limited liability company

By: _____

Title: _____

Attest: _____
Secretary
Date: _3/24/05_____

Tenant:
Quick-Turn Technologies, LLC

By: _____

Title: _CEO_____

Attest: _____
Secretary

Date: _3-24-05_____

Tenant:
Aircraft Investor Resources, LLC

By: _____

Title: _CEO_____

Attest: _____
Secretary

Date: _3-24/05_____

# EXHIBIT 2

## SUBLEASE OF STANDARD AIRPORT GROUND LEASE COPY

This Sublease of Standard Airport Ground Lease ("*Builder Sublease*") is made and effective as of January 17, 2005, by and between Quick-Turn Technologies, LLC, a Nevada limited liability company and Aircraft Investor Resources, LLC, a Nevada limited liability company (collectively, "*QTT/AIR*") and ER1, LLC, a Delaware limited liability company ("*ER1*").

### Factual Background

A.    QTT/AIR are the lessees of certain real property located in Bend, Oregon under that certain Standard Airport Master Lease dated October 7, 2004 (the "*Master Lease*") with the City of Bend, an Oregon Municipal Corporation ("*City*").

B.    The Master Lease affects certain land consisting of approximately 232,680 square feet as depicted and more particularly described on <u>Exhibit A</u> annexed hereto and made a part hereof (the "*Subleased Premises*").

C.    ER1 desires to sublease the Subleased Premises to construct an airplane manufacturing facility or for any other permitted use. Initially, ER1 will sublease the Subleased Premises to QTT/AIR and Tam-Air for the operation of an aircraft manufacturing facility.

D.    ER1 will obtain financing from The Bank of the Cascades (the "*Bank*") to construct the improvements contemplated by this Builder Sublease. In connection with the financing, ER1 will assign its interests under this Builder Sublease and the Airport Manufacturing Sublease (as defined herein) to the Bank and QTT/AIR will assign its interest under the Master Lease in favor of the Bank for security purposes.

### Agreement

**THEREFORE**, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt, sufficiency and adequacy of which is hereby acknowledged, it is agreed:

1.    *Sublease; Term.* QTT/AIR hereby subleases the Subleased Premises to ER1, and ER1 hereby subleases the same from QTT/AIR for a term of 30 years and three months commencing on April 1, 2005 and continuing until June 29, 2034. Provided QTT/AIR has exercised it rights to renew the Master Lease, ER1 shall have the option to extend the term of this Builder Sublease for two periods of ten years each. The original term and any renewal terms shall collectively be referred to herein as the "*Term*". By execution of the consent attached hereto, City has approved the sublease of the Subleased Premises by QTT/AIR to ER1.

2.    *Rental.* ER1 shall pay to QTT/AIR quarterly rent equal to $8,403.75, which such amount shall be paid on the first day of each calendar quarter. The rent shall be increased pursuant to Attachment D of the Master Lease on the first day of each July, commencing in July 2009. The rent may also be increased to comply with City's Uniform Rental Structure as

EXHIBIT ___A___

_____ OF _____

100399-002/Sublease QTTAIR to ER1 Final031705.doc

provided in the Master Lease. ER1 shall have the option to pay the rent directly to City. ER1 shall not be required to pay a security deposit of any kind.

3.    *Use.*  ER1 shall use the Subleased Premises for the purposes of: (a) construction and maintenance of structures in which aircraft will be manufactured and the storage of manufactured aircraft in compliance with City's General Aviation Minimum Standards, which City may amend from time to time as conditions warrant; (b) subject to Attachment E of the Master Lease, construction, operation and maintenance of hangars for further sublease and potentially condominium aircraft hangars for sale to aircraft owners on the Subleased Premises; or (c) any other permitted use.

4.    *ER1's Compliance with Master Lease.*  ER1 hereby acknowledges receipt of a copy of the Master Lease. The terms and conditions of the Master Lease are hereby incorporated into and made a part of this Builder Sublease as if ER1 was the tenant thereunder. ER1 agrees to perform the tenant's obligations under the Master Lease during the Term to the extent that such obligations are applicable to ER1 and the Subleased Premises. ER1 shall not commit or suffer any act or omission that will violate any of the provisions of the Master Lease. To the extent there are any provisions continued in this Builder Sublease that conflict with the terms and provisions of the Master Lease, this Builder Sublease shall be modified so that it conforms to the Master Lease.

5.    *QTT/AIR's Compliance with Master Lease; Assignment of Rights.*  In the event QTT/AIR defaults under any provision of the Master Lease, ER1 shall have the right to cure any default of QTT/AIR to ensure that the Master Lease remains in effect. QTT/AIR shall provide any notices it receives from City with respect to the Master Lease. Pursuant to Attachment E of the Master Lease, in the event QTT/AIR ceases to be a party to this Builder Sublease or the Master Lease, ER1 will recognize City as its landlord and continue to perform the obligations of tenant under the Master Lease.

6.    *Sublease and Assignment.*  Pursuant to that certain Property Improvements Lease dated January 17, 2005 (the *"Aircraft Manufacturer Sublease"*), ER1 shall initially sublease the Subleased Premises to QTT/AIR and Tam-Air, Inc., a Delaware corporation, for the purposes of aircraft manufacturing and storage.  City has approved the Aircraft Manufacturer Sublease pursuant to Attachment E of the Master Lease.

7.    *Construction of Facilities.*  During the Builder Sublease Term, ER1 shall construct the buildings necessary to operate an aircraft manufacturing facility as contemplated in the Master Lease and the Aircraft Manufacturer Sublease. ER1 shall make all necessary repairs to the Subleased Premises as required pursuant to the Master Lease and the Aircraft Manufacturer Sublease. ER1 shall be responsible for all costs associated with the construction of the facilities contemplated to be built on the Subleased Premises. ER1 shall acquire all necessary permits from City to construct the improvements on the Subleased Premises.

8.    *Alterations and Improvements.*  ER1 shall have the right to place and install personal property, trade fixtures, equipment and other temporary installations in and upon the Subleased Premises, and fasten the same to the Subleased Premises. All personal property, equipment, machinery, trade fixtures and temporary installations, whether acquired by ER1 at

2

the commencement of the Builder Sublease term or placed or installed on the Subleased Premises by ER1 thereafter, shall remain ER1's property free and clear of any claim by QTT/AIR. ER1 shall have the right to remove the same at any time during the Term and shall remove all such items at the end of the Term. All damage to the Subleased Premises caused by such removal shall be repaired by ER1 at ER1's expense.

9.    *Property Taxes.* ER1 shall pay, prior to delinquency, all general real estate taxes and installments of special assessments coming due during the Term on the Subleased Premises. ER1 shall be responsible for paying all personal property taxes with respect to ER1's personal property at the Subleased Premises.

10.    *Insurance.* ER1 and QTT/AIR shall, each at its own expense, maintain a policy or policies of comprehensive general liability insurance with respect to the respective activities of each on the Subleased Premises with the premiums thereon fully paid on or before due date, issued by and binding upon some insurance company reasonably approved by QTT/AIR and City, such insurance to afford minimum protection of not less than $2,000,000 combined single limit coverage of bodily injury, property damage or combination thereof. QTT/AIR shall be listed as an additional insured on ER1's policy or policies of comprehensive general liability insurance, and ER1 shall provide QTT/AIR with current Certificates of Insurance evidencing ER1's compliance with this paragraph.

11.    *Utilities.* ER1 shall pay all charges for water, sewer, gas, electricity, telephone and other services and utilities used by ER1 on the Subleased Premises during the Term of this Builder Sublease unless otherwise expressly agreed in writing by QTT/AIR. In the event that any utility or service provided to the Subleased Premises is not separately metered, QTT/AIR shall pay the amount due and separately invoice ER1 for ER1's pro rata share of the charges. ER1 shall pay such amounts within 15 days of invoice.

12.    *Entry.* QTT/AIR shall have the right to enter upon the Subleased Premises at reasonable hours to inspect the same, provided QTT/AIR shall not thereby unreasonably interfere with ER1's business on the Subleased Premises.

13.    *Liens.* ER1 shall keep the Subleased Premises and any improvements thereon free from all charges, liens, and encumbrances, whether arising out of work, labor or improvements, or arising out of ER1's occupancy or use of the Subleased Premises. In the event a lien is placed against the Subleased premises, ER1 shall, within 20 days after receiving notice of any mechanic's lien for material or work claimed to have been furnished to the Subleased Premises on ER1's behalf and at ER1's request: (i) discharge the lien; or (ii) post a bond and validly contest the lien. In the event that ER1 allows liens or assessments to be placed on the Subleased Premises or any improvement thereon and fails to promptly discharge said obligations, including any obligations for taxes, assessments, liens or other charges for which ER1 is responsible, QTT/AIR may pay the same and may redeem the Subleased Premises from any sale that may be made for taxes, assessments, charges, liens or encumbrances of any kind. Any amounts advanced by QTT/AIR shall accrue interest at the rate of 18% per annum. QTT/AIR shall be entitled to immediate payment of all sums so advanced, including, without limitation, legal costs and attorney fees; such sums shall be deemed additional rent and shall be a lien on ER1's interest in the Subleased Premises. ER1 shall indemnify and hold harmless

QTT/AIR and the Subleased Premises from any and all claims, liability or expenses, including attorneys' fees and costs, that QTT/AIR may incur by reason of any mechanic's lien or notice of mechanic's lien or claim for material or for labor furnished or claimed to have been furnished during the Term of this Builder Sublease in connection with the Subleased Premises when such material has been furnished or claimed to have been furnished at the instance or request of ER1.

14.    *Force Majeure.*  In the event that either party hereto shall be delayed, hindered or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure to power, restrictive governmental laws or regulations, riots, insurrection, war or other reason of a like nature not the fault of the party delayed in performing work or doing acts required under the terms of this Builder Sublease, then performance of such act shall be extended for a period equivalent to the period of such delay.

15.    *Default by ER1.*  If default shall at any time be made by ER1 in the payment of rent when due to QTT/AIR as herein provided, and if said default shall continue for 15 days after written notice thereof shall have been given to ER1 by QTT/AIR, or if default shall be made in any of the other covenants or conditions to be kept, observed and performed by ER1, and such default shall continue for 30 days after notice thereof in writing to ER1 by QTT/AIR without correction thereof then having been commenced and thereafter diligently prosecuted, QTT/AIR may declare the Term of this Builder Sublease ended and terminated by giving ER1 written notice of such intention, and if possession of the Subleased Premises is not surrendered, QTT/AIR may reenter said premises. QTT/AIR shall have, in addition to the remedy above provided, any other right or remedy available to QTT/AIR on account of any ER1 default, either in law or equity. QTT/AIR shall use reasonable efforts to mitigate its damages.

16.    *Quiet Possession.*  QTT/AIR covenants and warrants that upon performance by ER1 of its obligations hereunder, QTT/AIR will keep and maintain ER1 in exclusive, quiet, peaceable and undisturbed and uninterrupted possession of the Subleased Premises during the Term of this Builder Sublease.

17.    *Condemnation.*  If any legally constituted authority condemns the Subleased Premises, this Builder Sublease shall cease when the public authority takes possession, and QTT/AIR and ER1 shall account for rental as of that date. Such termination shall be without prejudice to the rights of either party to recover compensation from the condemning authority for any loss or damage caused by the condemnation. Neither party shall have any rights in or to any award made to the other by the condemning authority.

18.    *Counterparts.*  This Builder Sublease may be signed in one or more counterparts each, when taken together, forming one and the same complete agreement.

19. *Notice.* Any notice required or permitted under this Builder Sublease shall be deemed sufficiently given or served if sent by United States certified mail, return receipt requested, addressed as follows:

If to QTT/AIR to:

Quick Turn Technologies, LLC
2121 Redbird Drive
Las Vegas, Nevada 89134
Attn: *Rick Schromeck*
Telephone: (702) *702-682-2389*
Facsimile: (702) *702-233-2772*

Aircraft Investor Resources, LLC
2121 Redbird Drive
Las Vegas, Nevada 89134
Attn: *Rick Schromeck*
Telephone: (702) *SAA*
Facsimile: (702) *SAA*

If to ER1 to:

ER1, LLC
3965 South Durango Drive, Suite 106
Las Vegas, Nevada 89147
Attn: Ed Nigro
Telephone: (702) 247-1920
Facsimile: (702) 247-1917

If to the City of Bend to:

City of Bend
Attention: Airport Manager
P.O. Box 431
Bend, OR 97709-0431
Telephone: (541) 388-5505

If to Bank of the Cascades:

Bank of the Cascades
Attention: Julie Miller, Senior Vice President /
Regional Manager
1100 N.W. Wall Street
P.O. Box 369
Bend, OR 97709-0369
Telephone: (541) 385-6200
Facsimile: (541) 382-8780

The foregoing parties shall each have the right from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

20. *Brokers.* ER1 represents that ER1 was not shown the Subleased Premises by any real estate broker or agent and that ER1 has not otherwise engaged in, any activity which could form the basis for a claim for real estate commission, brokerage fee, finder's fee or other similar charge, in connection with this Builder Sublease.

21. *Waiver.* No waiver of any default of QTT/AIR or ER1 hereunder shall be implied from any omission to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default specified in the express waiver and that only for the time and to the extent therein stated. One or more waivers by QTT/AIR or ER1 shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition.

22. *Headings.* The headings used in this Builder Sublease are for convenience of the parties only and shall not be considered in interpreting the meaning of any provision of this Builder Sublease.

23. *Successors.* The provisions of this Builder Sublease shall extend to and be binding upon QTT/AIR and ER1 and their respective legal representatives, successors and assigns.

24. *Consent.* QTT/AIR shall not unreasonably withhold or delay its consent with respect to any matter for which QTT/AIR's consent is required or desirable under this Builder Sublease.

25. *Compliance with Law.* ER1 shall comply with all laws, orders, ordinances and other public requirements now or hereafter pertaining to ER1's use of the Subleased Premises. QTT/AIR shall comply with all other laws, orders, ordinances and other public requirements now or hereafter affecting the Subleased Premises.

26. *Final Agreement.* This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties.

27. *Governing Law.* This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of Oregon. In the event legal action is commenced to enforce the terms or provisions set forth in this Builder Sublease, jurisdiction for such legal action shall be exclusively in Deshutes County, Oregon.

**IN WITNESS WHEREOF**, the parties have executed this Builder Sublease as of the day and year first above written.

**QTT/AIR:**                                           **ER1:**

QUICK-TURN TECHNOLOGIES, LLC, a              ERI, LLC, a Delaware limited liability
Nevada limited liability company             company

By: _____                By: _____
Name: _Fred Schranch_                         Name: _Edward M Nigro_
Title: _CEO_                                  Title: _Manager_
                                                     _President, Nigro, Inc_

and

AIRCRAFT INVESTOR RESOURCES, LLC,
a Nevada limited liability company

By: _____
Name: _Fred "Rick" Schranch_
Title: _CEO_

7

# EXHIBIT 3

PROPERTY IMPROVEMENT LEASE

# EXHIBIT I

ARTICLE ONE:          BASIC TERMS

This Article One contains the Basic Terms of this Lease between the Landlord and Tenant named below. Other Articles, Sections and Paragraphs of the Lease referred to in this Article One explain and define the Basic Terms and are to be read in conjunction with the Basic Terms

Section 1.01.  **Date of Lease:** _____ *January 17, 2005*

Section 1.02.  **Landlord (include legal entity):** *ER I, a Delaware limited liability company*

Address of Landlord: _____ *3965 South Durango Drive, Ste. 106, Las Vegas, Nevada 89147*

Section 1.03.  **Tenant (include legal entity):** _____ *Quick-Turn Technologies, LLC, a Nevada limited liability company and Aircraft Investor Resources, LLC, a Nevada limited liability company; TAM-AIR Inc., a Delaware corporation*

Address of Tenant: _____ *2121 Redbird Drive, Las Vegas, NV 89134*

Section 1.04.  **Property:** The Property improvements described or depicted in Exhibit "A" (the "Project"). The Project includes, the buildings and all other improvements located on the land under Lease by Lessee from the City of Bent, Oregon, and the common areas described in Paragraph 4.05(a). The Property *is located at Bend Airport, Bend Oregon and is composed of a 90,000 square foot manufacturing and aircraft storage facility with associated on-site improvements.*

Section 1.05.  **Lease Term:** _12_ years _____ months beginning on _June 1, 2005_ such other date as is specified in this Lease, and **ending on** _May 30, 2017, with two (2) ten (10) year options to extend._

\*ACTUAL BEGINNING AND ENDING DATES MAY ADJUST DUE TO FINAL COMPLETION OF TENANT IMPROVEMENTS.
\*\* FIGURES MAY ADJUST BASED UPON FINAL, ACTUAL SQUARE FOOTAGE.

Section 1.06.  **Permitted Uses:** (See Article Five) _____ *Aircraft Manufacturing / Storage*

Section 1.07.  **Tenant's Guarantor:** (If none, so state) *Quick-Turn Technologies, LLC, a Nevada limited liability company and Aircraft Investor Resources, LLC, a Nevada limited liability company; TAM-AIR Inc., a Delaware corporation*

Section 1.08.  **Brokers:** (See Article Fourteen) (If none, so state)

Landlord's Broker: _NONE_
Tenant's Broker: _NONE_

Section 1.09.  **Commission Payable to Landlord's Broker:** (See Article Fourteen) $ _NONE_

INITIALS_____                                                    INITIALS_____

H:\NIGRO\ER 1, 2 & NLV\Lease NNN Exc ER1- Mod 1-17-2005.doc as if 1/19/2005 2:51 PM

Section 1.10.  **Initial Security Deposit:** (See Section 3.03) $ *Sixty-one Thousand Two Hundred Dollars ($61,200.00).*

Section 1.11.  **Vehicle Parking Spaces Allocated to Tenant:** (See Section 4.05) *See Site Plan Exhibit A.*

Section 1.12.  **Rent and Other Charges Payable by Tenant:**
(a) BASE RENT: ___*Forty-five Thousand Dollars*___
Dollars ($ _45,000.00_ ) per month for the first _12_ months, as provided in Section 3.01, and shall be increased on the first day of each twelve (12) month anniversary month(s) after the Commencement Date, either (i) as provided in Section 3.02, or (ii) _____ _N/A_ _____.
(If (ii) is completed, then (i) and Section 3.02 are inapplicable.)
(b) OTHER PERIODIC PAYMENTS: (i) Real Property Taxes (See Section 4.02); (ii) Utilities (See Section 4.03); (iii) Insurance Premiums (See Section 4.04); (iv) Tenant's Initial Pro Rata Share of Common Area Expenses _____(See Section 4.05); (v) Impounds for Insurance Premiums and Property Taxes (See Section 4.08); (vi) Maintenance, Repairs and Alterations (See Article Six) and Standard Airport Ground Lease payments to the City of Bend per the attached Lease (Exhibit C).

Section 1.13.  **Landlord's Share of Profit on Assignment or Sublease:** (See Section 9.05) ONE HUNDRED percent (100%) of the Profit (the "Landlord's Share").

Section 1.14.  **Riders:** The following Riders are attached to and made a part of this Lease: (If none, so state) *EXHIBIT "A", OPTION TO EXTEND LEASE TERM RIDER; EXHIBIT "B", GUARANTY OF LEASE; EXHIBIT "C", STANDARD AIRPORT GROUND LEASE BETWEEN CITY OF BEND AND LESSEE.*

ARTICLE TWO:      **LEASE TERM**
Section 2.01.  **Lease of Property For Lease Term.** Landlord leases the Property to Tenant and Tenant leases the Property from Landlord for the Lease Term.  The Lease Term is for the period stated in Section 1.05 above and shall begin and end on the dates specified in Section 1.05 above, unless the beginning or end of the Lease Term is changed under any provision of this Lease.  The "Commencement Date" shall be the date specified in Section 1.05 above for the beginning of the Lease Term, unless advanced or delayed under any provision of this Lease.

Section 2.02.  **Delay in Commencement.** Landlord shall not be liable to Tenant if Landlord does not deliver possession of the Property to Tenant on the Commencement Date.  Landlord's non-delivery of the Property to Tenant on that date shall not affect this Lease or the obligations of Tenant under this Lease except that the Commencement Date shall be delayed until Landlord delivers possession of the Property to Tenant and the Lease Term shall be extended for a period equal to the delay in delivery of possession of the Property to Tenant, plus the number of days necessary to end the Lease
Term on the last day of a month.  If delivery of possession of the Property to Tenant is delayed, Landlord and Tenant shall, upon such delivery, execute an amendment to this Lease setting forth the actual Commencement Date and expiration Date of the Lease.  Failure to execute such amendment shall not affect the actual Commencement Date and expiration date of the Lease.

Section 2.03.  **Early Occupancy.** If Tenant occupies the Property prior to the Commencement Date, Tenant's occupancy of the Property shall be subject to all of the provisions of this Lease.  Early

INITIALS_____

INITIALS_____

H:\WIGRO\ER 1, 2 & NE\VLease NNN Epic ER1~ Mod 1-17-2005.doc as if 1/18/2005 2:40 PM

occupancy of the Property shall not advance the expiration date of this Lease. Tenant shall pay Base Rent and all other charges specified in this Lease for the early occupancy period.

Section 2.04. **Holding Over.** Tenant shall vacate the Property upon the expiration or earlier termination of this Lease. Tenant shall reimburse Landlord for and indemnify Landlord against all damages which Landlord incurs from Tenant's delay in vacating the Property. If Tenant does not vacate the Property upon the expiration or earlier termination of the Lease and Landlord thereafter accepts rent from the Tenant, Tenant's occupancy of the Property shall be a "month-to-month" tenancy, subject to all of the terms of this Lease applicable to a month-to-month tenancy, except that the Base Rent then in effect shall be increased by twenty-five percent (25%).

## ARTICLE THREE:   BASE RENT

Section 3.01. **Time and Manner of Payment.** Upon execution of this Lease, Tenant shall pay Landlord the Base Rent in the amount stated in Paragraph 1.12(a) above for the first month of the Lease Term. On the first day of the second month of the Lease Term and each month thereafter, Tenant shall pay Landlord the Base Rent, in advance, without offset, deduction or prior demand. The Base Rent shall be payable at Landlord's address or at such other place as Landlord may designate in writing.

Section 3.02. **Cost of Living Increases.** The Base Rent shall be increased on each date (the "Rental Adjustment Date") stated in Paragraph 1.12(a) above in accordance with the increase in the United States Department of Labor, Bureau of Labor Statistics, Consumer Price Index for All Urban Consumers (all items for the geographical Statistical Area in which the Property is located on the basis of 1982-1984 = 100) (the "Index") as follows:

(a) The Base Rent (the "Comparison Base Rent") in effect immediately before each Rental Adjustment Date shall be increased by the percentage that the Index has increased from the date (the "Comparison Date") on which payment of the Comparison Base Rent began through the month in which the applicable Rental Adjustment Date occurs. The Base Rent shall not be reduced by reason of such computation. Landlord shall notify Tenant of each increase by a written statement which shall include the Index for the applicable Comparison Date, the Index for the applicable Rental Adjustment Date, the percentage increase between those two Indices, and the new Base Rent. Any increase in the Base Rent provided for in this Section 3.02 shall be subject to any minimum or maximum increase, if provided for in Paragraph 1.12(a).

(b) Tenant shall pay the new Base Rent from the applicable Rental Adjustment Date until the next Rental Adjustment Date. Landlord's notice may be given after the applicable Rental Adjustment Date of the increase, and Tenant shall pay Landlord the accrued rental adjustment for the months elapsed between the effective date of the increase and Landlord's notice of such increase within ten (10) days after Landlord's notice. If the format or components of the Index are materially changed after the Commencement Date, Landlord shall substitute an index which is published by the Bureau of Labor Statistics or similar agency and which is most nearly equivalent to the Index in effect on the Commencement Date. The substitute index shall be used to calculate the increase in the Base Rent unless Tenant objects to such index in writing within fifteen (15) days after receipt of Landlord's notice. If Tenant objects, Landlord ad Tenant shall submit the selection of the substitute index for binding arbitration in accordance with the rules and regulations of the American Arbitration Association at its office closest to the Property. The cost of arbitration shall be borne equally by Landlord and Tenant.

INITIALS_____

INITIALS_____

**Section 3.03. Security Deposit; Increases.**

(a) Upon the execution of this Lease, Tenant shall deposit with Landlord a cash Security Deposit in the amount set forth in Section 1.10 above. Landlord may apply all or part of the Security Deposit to any unpaid rent or other charges due from Tenant or to cure any defaults of Tenant. If Landlord uses any part of the Security Deposit, Tenant shall restore the Security Deposit to its full amount within ten (10) days after Landlord's written request. Tenant's failure to do so shall be a material default under this Lease. No interest shall be paid on the Security Deposit. Landlord shall not be required to keep the Security Deposit separate from its other accounts and no trust relationship is created with respect to the Security Deposit.

**Section 3.04. Termination; Advance Payments.** Upon termination of this Lease under Article Seven (Damage or Destruction), Article eight (Condemnation) or any other termination not resulting from Tenant's default, and after Tenant has vacated the Property in the manner required by this Lease, Landlord shall refund or credit to Tenant (or Tenant's successor) the unused portion of the Security Deposit, any advance rent or other advance payments made by Tenant to Landlord, and any amounts paid for real property taxes and other reserves which apply to any time periods after termination of the Lease.

## ARTICLE FOUR:    OTHER CHARGES PAYABLE BY TENANT

**Section 4.01. Additional Rent.** All charges payable by Tenant other then Base Rent are called "Additional Rent." Unless this Lease provides otherwise, Tenant shall pay all Additional Rent then due with the next monthly installment of Base Rent. The term "rent" shall mean Base Rent and Additional Rent.

**Section 4.02. Property Taxes**

(a) **Real Property Taxes.** Tenant shall pay all real property taxes on the Property (including any fees, taxes or assessments against, or as a result of, any tenant improvements installed on the Property by or for the benefit of Tenant) during the Lease Term. Subject to Paragraph 4.02(c) and Section 4.08 below, such payment shall be made at least ten (10) days prior to the delinquency date of the taxes. Within such ten (10) –day period, Tenant shall furnish Landlord with satisfactory evidence that the real property taxes have been paid. Landlord shall reimburse Tenant for any real property taxes paid by Tenant covering any period of time prior to or after the Lease Term. If Tenant fails to pay the real property taxes when due, Landlord may pay the taxes and Tenant shall reimburse Landlord for the amount of such tax payment as Additional Rent.

(b) **Definition of "Real Property Tax."** "Real Property Tax" means: (i) any fee, license fee, license tax, business license fee, commercial rental tax, levy, charge, assessment, penalty or tax imposed by any taxing authority against the Property; (ii) any tax on the Landlord's right to receive, or the receipt of, rent or income from the Property or against Landlord's business of leasing the Property; (iii) any tax or charge for fire protection, streets, sidewalks, road maintenance, refuse or other services provided to the Property by any governmental agency; (iv) any tax imposed upon this transaction or base upon a re-assessment of the Property due to a change of ownership, as defined by applicable law, or other transfer of all or part of Landlord's interest in the Property; and (v) any charge or fee replacing any tax previously included within the definition of real property tax. "Real property tax" does not, however, include Landlord's federal or state income, franchise, inheritance or estate taxes.

(c) **Joint Assessment.** If the Property is not separately assessed, Landlord shall reasonably determine Tenant's share of the real property tax payable by Tenant under Paragraph 4.02(a) from the

INITIALS_____

INITIALS_____

assessor's worksheets or other reasonably available information. Tenant shall pay such share to Landlord with fifteen (15) days after receipt of Landlord's written statement.

(d) **Personal Property Taxes.**

(i) Tenant shall pay all taxes charges against trade fixtures, furnishings, equipment or any other personal

property belonging to Tenant. Tenant shall try to have personal property taxed separately from the Property.

(ii) If any of Tenant's personal property is taxed with the Property, Tenant shall pay Landlord the taxes for

the personal property within fifteen (15) days after Tenant receives a written statement from Landlord for such personal property taxes.

(e) **Standard Airport Ground Lease.** Tenant shall pay all Rent, Other Annual Obligations and any Airport User Charges as specified in Exhibit C (attached Standard Airport Ground Lease).

Section 4.03. **Utilities.** Tenant shall pay, directly to the appropriate supplier, the cost of all natural gas, heat, light, power, sewer service, telephone, water, refuse disposal and other utilities and services supplied to the Property. However, if any services or utilities are jointly metered with other property, Landlord shall make a reasonable determination of Tenant's proportionate share of the cost of such utilities and services and Tenant shall pay such share to Landlord within fifteen (15) days after receipt of Landlord's written statement.

Section 4.04. **Insurance Policies.**

(a) **Liability Insurance.** During the Lease Term, Tenant shall maintain a policy of commercial general liability insurance (sometimes known as broad form comprehensive general liability insurance) insuring Tenant against liability for bodily injury, property damage (including loss of use of property) and personal injury arising out of the operation, use or occupancy of the Property. Tenant shall name Landlord as an additional insured under such policy. The initial amount of such insurance shall be Five Million Dollars ($5,000,000) per occurrence and shall be subject to periodic increase based upon inflation, increased liability awards, recommendation of Landlord's professional insurance advisers and other relevant factors. The liability insurance obtained by Tenant under this Paragraph 4.04(a) shall (i) be primary and non-contributing; (ii) contain cross-liability endorsements; and (iii) insure Landlord against Tenant's performance under Section 5.05, if the matters giving rise to the indemnity under Section 5.05 result from the negligence of Tenant. The amount and coverage of such insurance shall not limit Tenant's liability nor relieve Tenant of any other obligation under this Lease. Landlord may also obtain comprehensive public liability insurance in an amount and with coverage determined by Landlord insuring Landlord against liability arising out of ownership, operation, use or occupancy of the Property. The policy obtained by Landlord shall not be contributory and shall not provide primary insurance.

(b) **Property and Rental Income Insurance.** During the Lease Term, Landlord shall maintain policies of insurance covering loss of or damage to the Property in the full amount of its replacement value. Such policy shall contain an Inflation Guard Endorsement and shall provide protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, special extended perils (all risk), sprinkler leakage and any other perils which Landlord deems reasonably necessary. Landlord shall have the right to obtain flood and earthquake insurance if required by any lender holding a security interest in the Property. Landlord shall not obtain insurance for Tenant's fixtures or equipment or building improvements installed by Tenant on the Property. During the Lease Term, Landlord shall also maintain a rental income insurance policy, with loss payable to Landlord, in an amount equal to one year's Base Rent, plus estimated real property taxes and insurance premiums. Tenant shall be liable for the payment of any deductible amount under

INITIALS_____

INITIALS_____

Landlord's or Tenant's insurance policies maintained pursuant to this Section 4.04, in an amount not to exceed Ten Thousand Dollars ($10,000). Tenant shall not do or permit anything to be done which invalidates any such insurance policies.

(c) **Payment of Premiums.** Subject to Section 4.08, Tenant shall pay all premiums for the insurance policies described in Paragraphs 4.04(a) and (b) (whether obtained by Landlord or Tenant) within fifteen (15) days after Tenant's receipt of a copy of the premium statement or other evidence of the amount due, except Landlord shall pay all premiums for non-primary comprehensive public liability insurance which Landlord elects to obtain as provided in Paragraph 4.04(a). For the insurance policies maintained by Landlord which cover improvements on the entire Project, Tenant shall pay Tenant's prorated share of the premiums, in accordance with the formula in Paragraph 4.05(e) for determining Tenant's share of Common Area costs. If insurance policies maintained by Landlord cover improvements on real property other than the Project, Landlord shall deliver to Tenant a statement of the premium applicable to the Property showing in reasonable detail how Tenant's share of the premium was computed. If the Lease Term expires before the expiration of an insurance policy maintained by Landlord, Tenant shall be liable for Tenant's prorated share of the insurance premiums. Before the Commencement Date, Tenant shall deliver to Landlord a copy of any policy of insurance which Tenant is required to maintain under this Section 4.04. At least thirty (30) days prior to the expiration of any such policy, Tenant shall deliver to Landlord a renewal of such policy. As an alternative to providing a policy of insurance, Tenant shall have the right to provide Landlord a certificate of insurance, executed by an authorized officer of the insurance company, showing that the insurance which Tenant is required to maintain under this Section 4.04 is in full force and effect containing such other information which Landlord reasonably requires.

(d) **General Insurance Provisions.**

(i) Any insurance which Tenant is required to maintain under this Lease shall include a provision

which requires the insurance carrier to give Landlord not less than thirty (30) days' written notice prior to any cancellation or modification of such coverage.

(ii) If Tenant fails to deliver any policy, certificate or renewal to Landlord required under this Lease within

the prescribed time period or if any such policy is cancelled or modified during the Lease Term without the Landlord's consent, Landlord may obtain such insurance, in which case Tenant shall reimburse Landlord for the cost of such insurance within fifteen (15) days after receipt of a statement that indicated the cost of such insurance.

(iii) Tenant shall maintain all insurance required under this Lease with companies holding a

"General Policy Rating" of an A-12 or better, as set forth in the most current issue of "Best Key Rating Guide". Landlord and Tenant acknowledge the insurance markets are rapidly changing and that insurance in the form and amounts described in this Section 4.04 may not be available in the future. Tenant acknowledges that the insurance described in this Section 4.04 is for the primary benefit of Landlord. If at any time during the Lease Term, Tenant is unable to maintain the insurance required under the Lease, Tenant shall nevertheless maintain insurance coverage which is customary and commercially reasonable in the insurance industry for Tenant's type of business, as that coverage may change from time to time. Landlord makes no representation as to the adequacy of such insurance to protect Landlord's or Tenant's interests. Therefore, Tenant shall obtain any such additional property or liability insurance which Tenant deems necessary to protect Landlord and Tenant.

(iv) Unless prohibited under any applicable insurance policies maintained, Landlord and Tenant each hereby waive any and all rights of recovery against the other, or against the officers, employees, agents or representatives of the other, for loss of or damage to its property or the property of others under its control, if such loss or damage is covered by any insurance

INITIALS_____

INITIALS_____

H:\NEGRO\ER 1, 2 & NLV\Lease NNN Exc ER1- Mod 1-17-2005.doc as if 1/18/2005 2:40 PM

policy in force (whether or not described in this Lease) at the time of such loss or damage. Upon obtaining the required policies of insurance, Landlord and Tenant shall give notice to the insurance carriers of this mutual waiver of subrogation.

Section 4.05. **Common Areas; Use, Maintenance and Costs.**

(a) **Common Areas.** As used in this Lease, "Common Areas" shall mean all areas within the Project which are available for the common use of tenants of the Project and which are not leased or held for the exclusive use of Tenant or other tenants, including, but not limited to, parking areas, driveways, sidewalks, loading areas, access roads, corridors, landscaping and planted areas. Landlord, from time to time, may change the size, location, nature and use of any of the Common Areas, convert Common Areas into leaseable areas, construct additional parking facilities (including parking structures) in the Common Areas, and increase or decrease Common Area land and/or facilities. Tenant acknowledges that such activities may result in inconvenience to Tenant. Such activities and changes are permitted if they do not materially affect Tenant's use of the Property.

(b) **Use of Common Areas.** Tenant shall have the nonexclusive right (in common with other tenants and all others to whom Landlord has granted or may grant such rights) to use the Common Areas for the purposes intended, subject to such reasonable rules and regulations as Landlord may establish from time to time. Tenant shall abide by such rules and regulations and shall use its best effort to cause others who use the Common Areas with Tenant's express or implied permission to abide by Landlord's rules and regulations. At any time, Landlord may close any Common Areas to perform any acts in the Common Areas as, in Landlord's judgment, are desirable to improve the Project. Tenant shall not interfere with the rights of Landlord, other tenants or any other person entitled to use the Common Areas.

(c) **Specific Provision re: Vehicle Parking.** Tenant shall be entitled to use the number of vehicle parking spaces in the Project allocated to Tenant in Section 1.11 of the Lease without paying any additional rent. Tenant's parking shall not be reserved and shall be limited to vehicles no larger than standard size automobiles or pickup utility vehicles. Tenant shall not cause large trucks or other large vehicles to be parked within the Project or on the adjacent public streets. Temporary parking of large delivery vehicles in the Project may be permitted by the rules and regulations established by Landlord. Vehicles shall be parked only in striped parking spaces and not in driveways, loading areas or other locations not specifically designated for parking. Handicapped spaces shall only be used by those legally permitted to use them.* If Tenant parks more vehicles in the parking area than the number set forth in Section 1.11 of this Lease, such conduct shall be a material breach of this Lease. In addition to Landlord's other remedies under the Lease, Tenant shall pay a daily charge determined by Landlord for each such additional vehicle.

(d) **Maintenance of Common Areas.** Landlord shall maintain the Common Areas in good order, condition and repair and shall operate the Project, in Landlord's sole discretion, as a first-class industrial/commercial real property development. Tenant shall pay Tenant's pro rata share (as determined below) of all costs incurred by Landlord for the operation and maintenance of the Common Areas. Common Area costs include, but are not limited to, cost of expenses for the following: gardening and landscaping; utilities, water and sewage charges; maintenance of signs (other than tenants' signs); premiums for liability, property damage, fire and other types of casualty insurance on the Common Areas and worker's compensation insurance; all property taxes and assessments levied on or attributable to the Common Areas and all Common Area improvements; all personal property taxes levied on or attributable to personal property used in connection with the Common Areas; straight-line depreciation on personal property owned by Landlord which is consumed in the operation or maintenance of the Common Areas; rental or lease payments paid by Landlord for rented or leased personal property used in the operation or maintenance of the Common Areas; fees for required licenses and permits; repairing, resurfacing, repaving, maintaining, painting, lighting, cleaning, refuse

INITIALS_____

INITIALS_____

*FCB*

removal, security and similar items; reserves for roof replacement and exterior painting and other appropriate reserves; and a reasonable allowance to Landlord for Landlord's supervision of the Common Areas (not to exceed five percent (5%) of the gross rents of the Project for the calendar year). Landlord may cause any or all of such services to be provided by third parties and the cost of such services shall be included in Common Area costs. Common Area costs shall not include depreciation of real property which forms part of the Common Areas.

(e) **Tenant's Share and Payment.** Tenant shall pay Tenant's annual pro rata share of all Common Area costs (prorated for any fractional month) upon written notice from Landlord that such costs are due and payable, and in any event prior to delinquency. Tenant's pro rata share shall be calculated by dividing the square foot area of the Property, as set forth in Section 1.04 of the Lease, by the aggregate square foot area of the Project which is leased or held for lease by tenants, as of the date on which the computation is made. Tenant's initial pro rata share is set out in Paragraph 1.12(b). Any changes in the Common Area costs and/or the aggregate area of the Project leased or held for lease during the Lease Term shall be effective on the first day of the month after such change occurs. Landlord may, at Landlord's election, estimate in advance and charge to Tenant as Common Area costs, all real property taxes for which Tenant is liable under Section 4.02 of the Lease, all insurance premiums for which Tenant is liable under Section 4.04 of the Lease, all maintenance and repair costs for which Tenant is liable under Section 6.04 of the Lease, and all other Common Area costs payable by Tenant hereunder. At Landlord's election, such statements of estimated Common Area costs shall be delivered monthly, quarterly or at any other periodic intervals to be designated by Landlord. Landlord may adjust such estimates at any time based upon Landlord's experience and reasonable anticipation of costs. Such adjustments shall be effective as of the next rent payment date after notice to Tenant. Within sixty (60) days after the end of each calendar year of the Lease Term, Landlord shall deliver to Tenant a statement prepared in accordance with generally accepted accounting principles setting forth, in reasonable detail, the Common Area costs paid or incurred by Landlord during the preceding calendar year and Tenant's pro rata share. Upon receipt of such statement, there shall be an adjustment between Landlord and Tenant, with payment to or credit given by Landlord (as the case may be) so that Landlord shall receive the entire amount of Tenant's share of such costs and expenses for such period.

Section 4.06. **Late Charges.** Tenant's failure to pay rent promptly may cause Landlord to incur unanticipated costs. The exact amount of such costs are impractical or extremely difficult to ascertain. Such costs may include, but are not limited to, processing and accounting charges which may be imposed on Landlord by any ground lease, mortgage or trust deed encumbering the Property. Therefore, if Landlord does not receive any rent payment within ten (10) days after it becomes due, Tenant shall pay Landlord a late charge equal to ten percent (10%) of the overdue amount. The parties agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of such late payment.

Section 4.07. **Interest on Past Due Obligations.** Any amount owed by Tenant to Landlord which is not paid when due shall bear interest at the rate of fifteen percent (15%) per annum from the due date of such amount. However, interest shall not be payable on late charges to be paid by Tenant under this Lease. The payment of interest on such amounts shall not excuse or cure any default by Tenant under this Lease. If the interest rate specified in this Lease is higher than the rate permitted by law, the interest rate is hereby decreased to the maximum legal interest rate permitted by law.

Section 4.08. **Impounds for Insurance Premiums and Real Property Taxes.** If requested by any ground lessor or lender to whom Landlord has granted a security interest in the Property, or if Tenant is more than ten (10) days late in the payment of rent more than once in any consecutive twelve

(12) – month period, Tenant shall pay Landlord a sum equal to one-twelfth (1/12) of the annual real property taxes and insurance premiums payable by Tenant under this Lease, together with each payment of Base Rent. Landlord shall hold such payments in a non-interest bearing impound account. If unknown, Landlord shall reasonably estimate the amount of real property taxes and insurance premiums when due. Tenant shall pay any deficiency of funds in the impound account to Landlord upon written request. If Tenant defaults under this Lease, Landlord may apply any funds in the impound account to any obligation then due under this Lease.

## ARTICLE FIVE:    USE OF PROPERTY

Section 5.01.  **Permitted Uses.** Tenant may use the Property only for the Permitted Uses set forth in Section 1.06 above.

Section 5.02.  **Manner of Use.** Tenant shall not cause or permit the Property to be used in any way which constitutes a violation of any law, ordinance, or governmental regulation or order, which annoys or interferes with the rights of tenants of the Project, or which constitutes a nuisance or waste. Tenant shall obtain and pay for all permits, including a Certificate of Occupancy, required for Tenant's occupancy of the Property and shall promptly take all actions necessary to comply with all applicable statutes, ordinances, rules, regulations, orders and requirements regulating the use by Tenant of the Property, including the Occupational Safety and Health Act.

Section 5.03.  **Hazardous Materials.** As used in this Lease, the term "Hazardous Material" means any flammable items, explosives, radioactive materials, hazardous or toxic substances, material or waste or related materials, including any substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", or "toxic substances" now or subsequently regulated under any applicable federal, state or local laws or regulations, including without limitation petroleum-based products, paints, solvents, lead, cyanide, DDT, printing inks, acids, pesticides, ammonia compounds and other chemical products, asbestos, PCBs and similar compounds, and including any different products and materials which are subsequently found to have adverse effects on the environment or the health and safety of persons. Tenant shall not cause or permit any Hazardous Material to be generated, produced, brought upon, used, stored, treated or disposed of in or about the Property by Tenant, its agents, employees, contractors, sublessee's or invitees without the prior written consent of Landlord. Landlord shall be entitled to take into account such other factors or facts as Landlord may reasonably determine to be relevant in determining whether to grant or withhold consent to Tenant's proposed activity with respect to Hazardous Material.

Section 5.04.  **Signs and Auctions.** Tenant shall not place any signs on the Property without Landlord's prior written consent. Tenant shall not conduct or permit any auctions or sheriff's sales at the Property.

Section 5.05.  **Indemnity.**  Tenant shall indemnify Landlord against and hold Landlord harmless from any and all costs, claims or liability arising from: (a) Tenant's use of the Property; (b) the conduct of Tenant's business or anything else done or permitted by Tenant to be done in or about the Property, including any contamination of the Property or any other property resulting from the presence or use of Hazardous Material caused or permitted by Tenant; (c) any breach or default in the performance of Tenant's obligations under this Lease; (d) any misrepresentation or breach of warranty by Tenant under this Lease; or (e) other acts or omissions of Tenant. Tenant shall defend Landlord against any such cost, claim or liability at Tenant's expense with counsel reasonably acceptable to Landlord or, at Landlord's election, Tenant shall reimburse Landlord for any legal fees or costs

INITIALS_____

INITIALS_____

H:\NIGRO\ER 1, 2 & NLV\Lease NNN Epic ER1- Mod 1-17-2005.doc as if 1/18/2005 2:40 PM

incurred by Landlord in connection with any such claim. As a material part of the consideration to Landlord, Tenant assumes all risk of damage to property or injury to persons in or about the Property arising from any cause, and Tenant hereby waives all claims in respect thereof against Landlord, except for any claim arising out of Landlord's gross negligence or willful misconduct. As used in this Section, the term "Tenant" shall include Tenant's employees, agents, contractors and invitees, if applicable.

Section 5.06. **Landlord's Access.** Landlord or its agents may enter the Property at all reasonable times to show the Property to potential buyers, investors or tenants or other parties; to do any other act or to inspect and conduct tests in order to monitor Tenant's compliance with all applicable environmental laws and all laws governing the presence and use of Hazardous Material; or for any other purpose Landlord deems necessary. Landlord shall give Tenant prior notice of such entry, except in the case of an emergency. Landlord may place customary "For Sale" or "For Lease" signs on the Property.

Section 5.07. **Quiet Possession.** If Tenant pays the rent and complies with all other terms of this Lease, Tenant may occupy and enjoy the Property for the full Lease Term, subject to the provisions of this Lease.

**ARTICLE SIX:   CONDITION OF PROPERTY; MAINTENANCE, REPAIRS AND ALTERATIONS**

Section 6.01. **Existing Conditions.** Tenant accepts the Property in its condition as of the execution of the Lease, subject to all recorded matters, laws, ordinances, and governmental regulations and orders. Except as provided herein, Tenant acknowledges that neither Landlord nor any agent of Landlord has made any representation as to the condition of the Property or the suitability of the Property for Tenant's intended use. Tenant represents and warrants that Tenant has made its own inspection of and inquiry regarding the condition of the Property and is not relying on any representations of Landlord or any Broker with respect thereto. If Landlord or Landlord's Broker has provided a Property Information Sheet or other Disclosure Statement regarding the Property, a copy attached as an exhibit to the Lease.

Section 6.02. **Exemption of Landlord from Liability.** Landlord shall not be liable for any damage or injury to the person, business (or any loss of income therefrom), goods, wares, merchandise or other property of Tenant, Tenant's employees, invitees, customers or any other person in or about the Property, whether such damage or injury is caused by or results from: (a) fire, steam, electricity, water, gas or rain; (b) the breakage, leakage, obstruction or other defects of pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures or any other cause; (c) conditions arising in or about the Property or upon the other portions of the Project, or from other sources or places; or (d) any act or omission of any other tenant of the Project. Landlord shall not be liable for any such damage or injury even though the cause of or the means of repairing such damage or injury are not accessible to Tenant. The provisions of this Section 6.02 shall not, however, exempt Landlord from liability for Landlord's gross negligence or willful misconduct.

Section 6.03. **Landlord's Obligations.**

a) Except as provided in Article Seven (Damage or Destruction) and Article Eight (Condemnation), Landlord shall keep the following in good order, condition and repair: the foundations, exterior walls and roof of the Property (including painting the exterior surface of the

exterior walls of the Property not more often than once every five (5) years, if necessary). However, Landlord shall not be obligated to maintain components of electrical, mechanical, plumbing, heating and air conditioning systems or repair windows, doors, plate glass or the interior surfaces of exterior walls. Landlord shall make repairs under this Section 6.03 within a reasonable time after receipt of written notice from Tenant of the need for such repairs.

(b) Tenant shall pay or reimburse Landlord for all costs Landlord incurs under Paragraph 6.03(a) above as Common Area costs as provided for in Section 4.05 of the Lease. Tenant waives the benefit of any statute in effect now or in the future which might give Tenant the right to make repairs at Landlord's expense or to terminate this Lease due to Landlord's failure to keep the Property in good order, condition and repair.

## Section 6.04. **Tenant's Obligations.**

(a) Except as provided in Section 6.03, Article Seven (Damage or Destruction) and Article Eight (Condemnation), Tenant shall keep all portions of the Property (including structural, nonstructural, interior, systems and equipment) in good order, condition and repair (including interior repainting and refinishing, as needed). If any portion of the Property or any system or equipment in the Property which Tenant is obligated to repair cannot be fully repaired or restored, Tenant shall promptly replace such portion of the Property or system or equipment in the Property, regardless of whether the benefit of such replacement extends beyond the Lease Term; but if the benefit or useful life of such replacement extends beyond the Lease Term (as such term may be extended by exercise of any options), the useful life of such replacement shall be prorated over the remaining portion of the Lease Term (as extended), and Tenant shall be liable only for that portion of the cost of which is applicable to the Lease Term (as extended). Tenant shall maintain a preventive maintenance contract providing for the regular inspection and maintenance of the heating and air conditioning system by a licensed heating and air conditioning contractor, unless Landlord maintains such equipment under Section 6.03 above. If any part of the Property or the Project is damaged by any act or omission of Tenant, Tenant shall pay Landlord the cost of repairing or replacing such damaged property, whether or not Landlord would otherwise be obligated to pay the cost of maintaining or repairing such property. It is the intention of Landlord and Tenant that at all times Tenant shall maintain the portions of the Property which Tenant is obligated to maintain in an attractive, first-class and fully operative condition.

(b) Tenant shall fulfill all of Tenant's obligations under this Section 6.04 at Tenant's sole expense. If Tenant fails to maintain, repair or replace the Property as required by this Section 6.04, Landlord may, upon ten (10) days' prior notice to Tenant (except that no notice shall be required in the case of an emergency), enter the Property and perform such maintenance or repair (including replacement, as needed) on behalf of Tenant. In such case, Tenant shall reimburse Landlord for all cost incurred in performing such maintenance or repair immediately upon demand.

## Section 6.05. **Alterations, Additions, and Improvements.**

(a) Tenant shall not make any alterations, additions, or improvements to the Property without Landlord's prior written consent, except for non-structural alterations which do not exceed Ten Thousand Dollars ($10,000) in cost cumulatively over the Lease Term and which are not visible from the outside of any building of which the Property is part. Landlord may require Tenant to provide demolition and/or lien and completion bonds in form and amount satisfactory to Landlord. Tenant shall promptly remove any alterations, additions, or improvements constructed in violation of this Paragraph 6.05(a) upon Landlord's written request. All alterations, additions, and improvements shall be done in a good and workmanlike manner, in conformity with all applicable laws and regulations, and by a contractor approved by Landlord. Upon completion of any such work, Tenant shall provide

INITIALS_____

INITIALS_____

Landlord with "as built" plans, copies of all construction contracts, and proof of payment for all labor and materials.

(b) Tenant shall pay when due all claims for labor and material furnished to the Property. Tenant shall give Landlord at least twenty (20) days' prior written notice of the commencement of any work on the Property, regardless of whether Landlord's consent to such work is required. Landlord may elect to record and post notices of non-responsibility on the Property.

Section 6.06. **Condition upon Termination.** Upon the termination of the Lease, Tenant shall surrender the Property to Landlord, broom clean and in the same condition as received except for ordinary wear and tear which Tenant was not otherwise obligated to remedy under any provision of this Lease. However, Tenant shall not be obligated to repair any damage which Landlord is required to repair under Article Seven (Damage or Destruction). In addition, Landlord may require Tenant to remove any alterations, additions or improvements (whether or not made with Landlord's consent) prior to the expiration of the Lease and to restore the Property to its prior condition, all at Tenant's expense. All alterations, additions and improvements which Landlord has not required Tenant to move shall become Landlord's property and shall be surrendered to Landlord upon the expiration or earlier termination of the Lease, except that Tenant may remove any of Tenant's machinery or equipment which can be removed without material damage to the Property. Tenant shall repair, at Tenant's expense, any damage to the Property caused by the removal of any such machinery or equipment. In no event, however, shall Tenant remove any of the following materials or equipment (which shall be deemed Landlord's property) without Landlord's prior written consent: any power wiring or power panels; lighting or lighting fixtures; wall coverings; drapes; blinds or other window coverings; carpets or other floor coverings; heaters, air conditioners or any other heating or air conditioning equipment; fencing or security gates; or other similar building operating equipment and decorations.

## ARTICLE SEVEN:   DAMAGE OR DESTRUCTION

Section 7.01. **Partial Damage to Property.**

(a) Tenant shall notify Landlord in writing immediately upon the occurrence of any damage to the Property. If the Property is only partially damaged (i.e., less than fifty percent (50%) of the Property is untenantable as a result of such damage or less than fifty percent (50%) of Tenant's operations are materially impaired) and if the proceeds received by Landlord from the insurance policies described in Paragraph 4.04(b) are sufficient to pay for the necessary repairs, this Lease shall remain in effect and Landlord shall repair the damage as soon as reasonably possible. Landlord may elect (but is not required) to repair any damage to Tenant's fixtures, equipment, or improvements.

(b) If the insurance proceeds received by Landlord are not sufficient to pay the entire cost of repair, or if the cause of the damage is not covered by the insurance policies which Landlord maintains under Paragraph 4.04(b), Landlord may elect either to (i) repair the damage as soon as reasonably possible, in which case this Lease shall remain in full force and effect, or (ii) terminate this Lease as of the date the damage occurred. Landlord shall notify Tenant within thirty (30) days after receipt of notice of the occurrence of the damage whether Landlord elects to repair the damage or terminate the Lease. If Landlord elects to repair the damage, Tenant shall pay Landlord the "deductible amount" (if any) under Landlord's insurance policies and, if the damage was due to and act or omission of Tenant, or Tenant's employees, agents, contractors or invitees, the difference between the actual cost of repair and any insurance proceeds received by Landlord. If Landlord elects to terminate the Lease, Tenant may elect to continue this Lease in full force and effect, in which case Tenant shall repair any damage to the Property and any building in which the Property is located. Tenant shall pay the cost of such repairs, except that upon satisfactory completion of such repairs, Landlord shall deliver to Tenant any insurance proceeds received by Landlord for the damage repaired by Tenant. Tenant shall give

INITIALS_____

INITIALS_____

Landlord written notice of such election within ten (10) days after receiving Landlord's termination notice.

(c) If the damage to the Property occurs during the last six (6) months of the Lease Term and such damage will require more than thirty (30) days to repair, either Landlord or Tenant may elect to terminate this Lease as of the date the damage occurred, regardless of the sufficiency of any insurance proceeds. The party electing to terminate this Lease shall give written notification to the other party of such election within thirty (30) days after Tenant's notice to Landlord of the occurrence of the damage.

Section 7.02. **Substantial or Total Destruction.** If the Property is substantially or totally destroyed by any cause whatsoever (i.e., the damage to the Property is greater than partial damage as described in Section 7.01), and regardless of whether Landlord receives any insurance proceeds, this Lease shall terminate as of the date the destruction occurred. Notwithstanding the preceding sentence, if the Property can be rebuilt within six (6) months after the date of destruction, Landlord may elect to rebuild the Property at Landlord's own expense, in which case this Lease shall remain in full force and effect. Landlord shall notify Tenant such election within thirty (30) days after Tenant's notice of the occurrence of total or substantial destruction. If Landlord so elects, Landlord shall rebuild the Property at Landlord's sole expense, except that if the destruction was caused by an act or omission of Tenant, Tenant shall pay Landlord the difference between the actual cost of rebuilding and any insurance proceeds received by Landlord.

Section 7.03. **Temporary Reduction of Rent.** If the Property is destroyed or damaged and Landlord or Tenant repairs or restores the Property pursuant to the provisions of this Article Seven, any rent payable during the period of such damage, repair and/or restoration shall be reduced according to the degree, if any, to which Tenant's use of the Property is impaired. However, the reduction shall not exceed the sum of one year's payment of Base Rent, insurance premiums and real property taxes. Tenant shall not be entitled to any compensation, reduction, or reimbursement from Landlord as a result of any damage, destruction, repair or restoration of or to the Property.

Section 7.04. **Waiver.** Tenant waives the protection of any statute, code or judicial decision which grants a tenant the right to terminate a lease in the event of the substantial or total destruction of the leased property. Tenant agrees that the provisions of Section 7.02 above shall govern the rights and obligations of Landlord and Tenant in the event of any substantial or total destruction to the Property.

ARTICLE EIGHT:          **CONDEMNATION**

If all or any portion of the Property is taken under the power of eminent domain or sold under the threat of that power (all of which are called "Condemnation"), this Lease shall terminate as to the part taken or sold on the date the condemning authority takes title or possession, whichever occurs first. If more than twenty percent (20%) of the floor area of the building in which the Property is located, or which is located on the Property, is taken, either Landlord or Tenant may terminate this Lease as of the date the condemning authority takes title or possession, by delivering written notice to the other within ten (10) days after receipt of written notice of such taking (or in the absence of such notice, within ten (10) days after the condemning authority takes title or possession). If neither Landlord nor Tenant terminates this Lease, this Lease shall remain in effect as to the portion of the Property not taken, except that the Base Rent and Additional Rent shall be reduced in proportion to the reduction in the floor area of the Property. Any Condemnation award or payment shall be distributed in the following order: (a) first, to any ground lessor, mortgagee or beneficiary under a deed of trust encumbering the Property, the amount of its interest in the Property; (b) second, to Tenant, only the

INITIALS_____
_____

INITIALS_____
253

amount of any award specifically designated for loss of or damage to Tenant's trade fixtures or removable personal property; and (c) third, to Landlord, the remainder of such award, whether as compensation for reduction in the value of the leasehold, the taking of the fee, or otherwise. If this Lease is not terminated, Landlord shall repair any damage to the Property caused by the Condemnation, except that Landlord shall not be obligated to repair any damage for which Tenant has been reimbursed by the condemning authority. If the severance damages received by Landlord are not sufficient to pay for such repair, Landlord shall have the right to either terminate this Lease or make such repair at Landlord's expense.

ARTICLE NINE:          ASSIGNMENT AND SUBLETTING

Section 9.01.  **Landlord's Consent Required.**  No portion of the Property or of Tenant's Interest in this Lease may be acquired by any other person or entity, whether by sale, assignment, mortgage, sublease, transfer, operation of law, or act of Tenant, without Landlord's prior written consent, except as provided in Section 9.02 below.  Landlord has the right to grant or withhold its consent as provided in Section 9.05 below.  Any attempted transfer without consent shall be void and shall constitute a non-curable breach of this Lease.  If Tenant is a partnership, any cumulative transfer of more than twenty percent (20%) of the partnership interests shall require Landlord's consent.  If Tenant is a corporation, any change in the ownership of a controlling interest of the voting stock of the corporation shall require Landlord's consent.

Section 9.02.  **Tenant Affiliate.**  Tenant may assign this Lease or sublease the Property, without Landlord's consent, to any corporation which controls, is controlled by or is under common control with Tenant, or to any corporation resulting from the merger of or consolidation with Tenant ("Tenant's Affiliate").  In such case, any Tenant's Affiliate shall assume in writing all of Tenant's obligations under this Lease.

Section 9.03.  **No Release of Tenant.**  No transfer permitted by this Article Nine, whether with or without Landlord's consent, shall release Tenant or change Tenant's primary liability to pay the rent and to perform all other obligations of Tenant under this Lease.  Landlord's acceptance of rent from any other person is not a waiver of any provision of this Article Nine.  Consent to one transfer is not a consent to any subsequent transfer.  If Tenant's transferee defaults under this Lease, Landlord may proceed directly against Tenant without pursuing remedies against the transferee.  Landlord may consent to subsequent assignments or modifications of this Lease by Tenant's transferee, without notifying Tenant or obtaining its consent.  Such action shall not relieve Tenant's liability under this Lease.

Section 9.04.  **Offer to Terminate.**  If Tenant desires to assign the Lease or sublease the Property, Tenant shall have the right to offer, in writing, to terminate the lease as of a date specified in the offer.  If Landlord elects in writing to accept the offer to terminate within twenty (20) days after notice of the offer, the Lease shall terminate as of the date specified and all the terms and provisions of the Lease governing termination shall apply.  If Landlord does not so elect, the Lease shall continue in effect until otherwise terminated and the provisions of Section 9.05 with respect to any proposed transfer shall continue to apply.

Section 9.05.  **Landlord's Consent.**

(a)  Tenant's request for consent to any transfer described in Section 9.01 shall set forth in writing the details of the proposed transfer, including the name, business and financial condition of the prospective transferee, financial details of the proposed transfer (e.g., the term of and the rent and

INITIALS_____

INITIALS_____

security deposit payable under any proposed assignment or sublease and any other matters Landlord deems relevant. Landlord shall have the right to withhold consent, if reasonable, based on the following factors: (i) the business of the proposed assignee or subtenant and the proposed use of the Property; (ii) the net worth and financial reputation of the proposed assignee or subtenant; (iii) Tenant's compliance with all of its obligations under the Lease; and (iv) such other factors as Landlord may reasonably deem relevant. If Landlord objects to a proposed assignment solely because of the net worth and/or financial reputation of the proposed assignee, Tenant may nonetheless sublease (but not assign), all or a portion of the Property to the proposed transferee, but only on the other terms of the proposed transfer.

(b) If Tenant assigns or subleases, the following shall apply:

(i) Tenant shall pay to Landlord as Additional Rent under the Lease the Landlord's Share (stated in Section 1.13) of the Profit (defined below) on such transaction as and when received by Tenant, unless Landlord gives written notice to Tenant and the assignee or subtenant that Landlord's Share shall be paid by the assignees or subtenant to Landlord directly. The "Profit" means (A) all amounts paid to Tenant for such assignment or sublease, including "key" money, monthly rent in excess of the monthly rent payable under the Lease, and all fees and other consideration paid for the assignment or sublease, including fees under any collateral agreements, less (B) costs and expenses directly incurred by Tenant in connection with the execution and performance of such assignment or sublease for real estate broker's commissions and costs of renovation for construction of tenant improvements required under such assignment or sublease. Tenant is entitled to recover such costs and expenses before Tenant is obligated to pay the Landlord's Share to Landlord. The Profit in the case of a sublease of less than all the Property is the rent allocable to the subleased space as a percentage on a square footage basis.

(ii) Tenant shall provide Landlord a written statement certifying all amounts to be paid from any assignment or sublease of the Property within thirty (30) days after the transaction documentation is signed, and Landlord may inspect Tenant's books and records to verify the accuracy of such statement. On written request, Tenant shall promptly furnish to Landlord copies of all the transaction documentation, all of which shall be certified by Tenant to be complete, true and correct. Landlord's receipt of Landlord's Share shall not be a consent to any further assignment or subletting. The breach of Tenant's obligation under this Paragraph 9.05(b) shall be a material default of the Lease.

Section 9.06. **No Merger.** No merger shall result from Tenant's sublease of the Property under this Article Nine, Tenant's surrender of this Lease or the termination of this Lease in any other manner. In any such event, Landlord may terminate any or all subtenancies or succeed to the interest of Tenant as sublandlord under any or all subtenancies.

## ARTICLE TEN: DEFAULTS; REMEDIES

Section 10.01. **Covenants and Conditions.** Tenant's performance of each of Tenant's obligations under this Lease is a condition as well as a covenant. Tenant's right to continue in possession of the Property is conditioned upon such performance. Time is of the essence in the performance of all covenants and conditions.

Section 10.02. **Defaults.** Tenant shall be in material default under this Lease:

(a) If Tenant abandons the Property or if Tenant's vacation of the Property results in the cancellation of any insurance described in Section 4.04;

(b) If Tenant fails to pay rent or any other charge when due;

(c) If Tenant fails to perform any of Tenant's non-monetary obligations under this Lease for a period of thirty (30) days after written notice from Landlord; provided that if more than thirty (30)

INITIALS_____

_____

INITIALS_____

H:\NIS\GROWER 1, 2 & NLVLease NNN Epic ER1- Mod 1-17-2005.doc as If 1/18/2005 2:40 PM

days are required to complete such performance, Tenant shall not be in default if Tenant commences such performance within the thirty (30) -day period and thereafter diligently pursues its completion. However, Landlord shall not be required to give such notice if Tenant's failure to perform constitutes a non-curable breach of this Lease. The notice required by this Paragraph is intended to satisfy any and all notice requirements imposed by law on Landlord and is not in addition to any such requirement.

(d) (i) If Tenant makes a general assignment or general arrangement for the benefit of creditors; (ii) if a petition for adjudication of bankruptcy or for reorganization or rearrangement is filed by or against Tenant and is not dismissed within thirty (30) days; (iii) if a trustee or receiver is appointed to take possession of substantially all of Tenant's assets located at the Property or of Tenant's interest in this Lease and possession is not restored to Tenant within thirty (30) days; or (iv) if substantially all of Tenant's assets located at the Property or of Tenant's interest in this Lease is subjected to attachment, execution or other judicial seizure which is not discharged within thirty (30) days. If a court of competent jurisdiction determines that any of the acts described in this subparagraph (d) is not a default under this Lease, and a trustee is appointed to take possession (or if Tenant remains a debtor in possession) and such trustee or Tenant transfers Tenant's interest hereunder, then Landlord shall receive, as Additional Rent, the excess, if any, of the rent (or any other consideration) paid in connection with such assignment or sublease over the rent payable by Tenant under this Lease.

(e) If any guarantor of the Lease revokes or otherwise terminates, or purports to revoke or otherwise terminate, any guaranty of all or any portion of Tenant's obligations under the Lease. Unless otherwise expressly provided, no guaranty of the Lease is revocable.

Section 10.03. **Remedies.** On the occurrence of any material default by Tenant, Landlord may, at any time thereafter, with or without notice or demand and without limiting Landlord in the exercise of any right or remedy which Landlord may have;

(a) Terminate Tenant's right to possession of the Property by any lawful means, in which case this Lease shall terminate and Tenant shall immediately surrender possession of the Property to Landlord. In such event, Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default, including (i) the worth at the time of the award of the unpaid Base Rent, Additional Rent and other charges which Landlord had earned at the time of the termination; (ii) the worth at the time of the award of the amount by which the unpaid Base Rent, Additional Rent and other charges which Landlord would have earned after termination until the time of the award exceeds the amount of such rental loss that Tenant proves Landlord could have reasonably avoided; (iii) the worth at the time of the award of the amount by which the unpaid Base Rent, Additional Rent and other charges which Tenant would have paid for the balance of the Lease Term after the time of award exceeds the amount of such rental loss that Tenant proves Landlord could have reasonably avoided; and (iv) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under the Lease or which in the ordinary course of things would be likely to result therefrom, including, but not limited to, any costs or expenses Landlord incurs in maintaining or preserving the Property after such default, the cost of recovering possession of the Property, expenses of reletting, including necessary renovation or alteration of the Property, Landlord's reasonable attorneys' fees incurred in connection therewith, and any real estate commission paid or payable. As used in subparts (i) and (ii) above, the "worth at the time of the award" is computed by allowing interest on unpaid amounts at the rate of fifteen percent (15%) per annum, or such lesser amount as may then be the maximum lawful rate. As used in subpart (iii) above, the "worth at the time of the award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award, plus one percent (1%). If Tenant has abandoned the Property, Landlord shall have the option of (i) retaking possession of the Property and recovering from Tenant the amount specified in this Paragraph 10.03(a), or (ii) proceeding under Paragraph 10.03(b);

INITIALS_____

INITIALS_____

(b) Maintain Tenant's right possession, in which case this Lease shall continue in effect whether or not Tenant has abandoned the Property. In such event, Landlord shall be entitled to enforce all of Landlord's right and remedies under this Lease, including the right to recover the rent as it becomes due;

(c) Pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of the state in which the Property is located.

Section 10.05. **Automatic Termination.** Notwithstanding any other term or provision hereof to the contrary, the Lease shall terminate on the occurrence of any act which affirms the Landlord's intention to terminate the Lease as provided in Section 10.03 hereof, including the filing of an unlawful detainer action against Tenant. On such termination, Landlord's damages for default shall include all costs and fees, including reasonable attorneys' fees that Landlord incurs in connection with the filing, commencement, pursuing and/or defending of any action in any bankruptcy court or other court with respect to the Lease; the obtaining of relief from any stay in bankruptcy restraining any action to evict Tenant; or the pursuing of any action with respect to Landlord's right to possession of the Property. All such damages suffered (apart from Base Rent and other rent payable hereunder) shall constitute pecuniary damages which must be reimbursed to Landlord prior to assumption of the Lease by Tenant or any successor to Tenant in any bankruptcy or other proceeding.

Section 10.06. **Cumulative Remedies.** Landlord's exercise of any right or remedy shall not prevent it from exercising any other right or remedy.

## ARTICLE ELEVEN: PROTECTION OF LENDERS

Section 11.01. **Subordination.** Landlord shall have the right to subordinate this Lease to any ground lease, deed of trust or mortgage encumbering the Property, any advances made on the security thereof and any renewals, modifications, consolidations, replacements or extensions thereof, whenever made or recorded. Tenant shall cooperate with Landlord and any lender which is acquiring a security interest in the Property or the Lease. Tenant shall execute such further documents and assurances as such lender may require, provided that Tenant's obligations under this Lease shall not be increased in any material way (the performance of ministerial acts shall not be deemed material), and Tenant shall not be deprived of its rights under this Lease. Tenant's right to quiet possession of the Property during the Lease Term shall not be disturbed if Tenant pays the rent and performs all of Tenant's obligations under this Lease and is not otherwise in default. If any ground lessor, beneficiary or mortgagee elects to have this Lease prior to the lien of its ground lease, deed of trust or mortgage and gives written notice thereof to Tenant, this Lease shall be deemed prior to such ground lease, deed of trust or mortgage whether this Lease is dated prior or subsequent to the date of said ground lease, deed of trust or mortgage or the date of recording thereof.

Section 11.02. **Attornment.** If Landlord's interest in the Property is acquired by any ground lessor, beneficiary under a deed of trust, mortgagee, or purchaser at a foreclosure sale, Tenant shall attorn to the transferee of or successor to Landlord's interest in the Property and recognize such transferee of successor as Landlord under this Lease. Tenant waives the protection of any statute or rule of law which gives or purports to give Tenant any right to terminate this Lease or surrender possession of the Property upon the transfer of Landlord's interest.

Section 11.03. **Signing of Documents.** Tenant shall sign and deliver any instrument or documents necessary or appropriate to evidence any such attornment or subordination or agreement to do so. If Tenant fails to do so within ten (10) days after written request, Tenant hereby makes,

INITIALS_____

INITIALS_____

constitutes and irrevocably appoints Landlord, or any transferee or successor of Landlord, the attorney-in-fact of Tenant to execute and deliver any such instrument or document.

Section 11.04. **Estoppel Certificates.**

(a) Upon landlord's written request, Tenant shall execute, acknowledge and deliver to Landlord a written statement certifying: (i) that none of the terms or provisions of this Lease have been changed (or if they have been changed, stating how they have been changed); (ii) that this Lease has not been cancelled or terminated; (iii) the last date of payment of the Base Rent and other charges and the time periods covered by such payment; (iv) that Landlord is not in default under this Lease (or, if Landlord is claimed to be in default, stating why); and (v) such other representations or information with respect to Tenant or the Lease as Landlord may reasonably request or which any prospective purchaser or encumbrancer of the Property may require. Tenant shall deliver such statement to Landlord within ten (10) days after Landlord's request. Landlord may give any such statement by Tenant to any prospective purchaser or encumbrancer of the Property. Such purchaser or encumbrancer may rely conclusively upon such statement as true and correct.

(b) If Tenant does not deliver such statement to Landlord within such ten (10) –day period, Landlord, and any prospective purchaser or encumbrancer, may conclusively presume and rely upon the following facts: (i) that the terms and provisions of this Lease have not been changed except as otherwise represented by Landlord; (ii) that this Lease has not been cancelled or terminated except as otherwise represented by Landlord; (iii) that not more than one month's Base Rent or other charges have been paid in advance; and (iv) that Landlord is not in default under the Lease. In such event, Tenant shall be estopped from denying the truth of such facts.

Section 11.05. **Tenant's Financial Condition.** Within ten (10) days after written request from Landlord, Tenant shall deliver to Landlord such financial statements as Landlord reasonably requires to verify the net worth of Tenant or any assignees, subtenant, or guarantor of Tenant. In addition, Tenant shall deliver to any lender designated by Landlord any financial statements required by such lender to facilitate the financing or refinancing of the Property. Tenant represents and warrants to Landlord that each financial statement is a true and accurate statement as of the date of such statement. All financial statements shall be confidential and shall be used only for the purposes set forth in this Lease.

## ARTICLE TWELVE: **LEGAL COSTS**

Section 12.01. **Legal Proceedings.** If Tenant or Landlord shall be in breach or default under this Lease, such party (the "Defaulting Party") shall reimburse the other party (the "Nondefaulting Party") upon demand for any costs or expenses that the Nondefaulting Party incurs in connection with any breach or default of the Defaulting Party under this Lease, whether or not suit is commenced or judgment entered. Such costs shall include legal fees and costs incurred for the negotiation of a settlement, enforcement or rights or otherwise. Furthermore, if any action for breach of or to enforce the provisions of this Lease is commenced, the court in such action shall award to the party in which favor a judgment is entered, a reasonable sum as attorneys' fees and costs. The losing party in such action shall pay such attorneys' fees and costs. Tenant shall also indemnify Landlord against and hold Landlord harmless from all costs, expenses, demands and liability Landlord may incur if Landlord becomes or is made a party to any claim or action (a) instituted by Tenant against any third party, or by any third party against Tenant, or by or against any person holding any interest under or using or using the Property by license of or agreement with Tenant; (b) for foreclosure of any lien for labor or material furnished to or for Tenant or such other person; (c) otherwise arising out of or resulting from any act or transaction of Tenant or such other person; or (d) necessary to protect Landlord's interest

under this Lease in a bankruptcy proceeding, or other proceeding under Title 11 of the United States Code, as amended. Tenant shall defend Landlord against any such claim or action at Tenant's expense with counsel reasonably acceptable to Landlord or, at Landlord's election, Tenant shall reimburse Landlord for any legal fees or costs Landlord incurs in any such claim or action.

Section 12.02. **Landlord's Consent.** Tenant shall pay Landlord's reasonable attorneys' fees incurred in connection with Tenant's request for Landlord's consent under Article Nine (Assignment and Subletting), or in connection with any other act which Tenant proposes to do and which requires Landlord's consent.

ARTICLE THIRTEEN:        MISCELLANEOUS PROVISIONS

Section 13.01. **Non-Discrimination.** Tenant promises, and it is a condition to the continuance of this Lease, that there will be no discrimination against, or segregation of, any person or group of persons on the basis of race, color, sex, creed, national origin or ancestry in the leasing, subleasing, transferring, occupancy, tenure or use of the Property or any portion thereof.

Section 13.02. **Landlord's Liability; Certain Duties.**
(a) As used in this Lease, the term "Landlord" means only the current owner or owners of the fee title to the Property or Project or the leasehold estate under a ground lease of the Property or Project at the time in question. Each Landlord is obligated to perform the obligations of Landlord under this Lease only during the time such Landlord owns such interest or title. Any Landlord who transfers its title or interest is relieved of all liability with respect to the obligations of Landlord under this Lease to be performed on or after the date of transfer. However, each Landlord shall deliver to its transferee all funds that Tenant previously paid if such funds have not yet been applied under the terms of this Lease.

(b) Tenant shall give written notice of any failure by Landlord to perform any of its obligations under this Lease to Landlord and to any ground lessor, mortgagee or beneficiary under any deed of trust encumbering the Property whose name and address have been furnished to Tenant in writing. Landlord shall not be in default under this Lease unless Landlord (or such ground lessor, mortgagee or beneficiary) fails to cure such non-performance within thirty (30) days after receipt of Tenant's notice. However, if such non-performance reasonably requires more than thirty (30) days to cure, Landlord shall not be in default if such cure is commenced within such thirty (30) -day period and thereafter diligently pursued to completion.

(c) Notwithstanding any term or provision herein to the contrary, the liability of Landlord for the performance of its duties and obligations under this Lease is limited to Landlord's interest in the Property and the Project, and neither the Landlord nor its partners, shareholders, officers or other principals shall have any personal liability under this Lease.

Section 13.03. **Severability.** A determination by a court of competent jurisdiction that any provision of this Lease or any part thereof is illegal or unenforceable shall not cancel or invalidate the remainder of such provision or this Lease, which shall remain in full force and effect.

Section 13.04. **Interpretation.** The captions of the Articles or Sections of this Lease are to assist the parties in reading this Lease and are not a part of the terms or provisions of this Lease. Whenever required by the context of this Lease, the singular shall include the plural and the plural shall include the singular. The masculine, feminine and neuter genders shall each include the other. In any provision relating to the conduct, acts or omissions of Tenant, the term "Tenant" shall include

INITIALS_____

INITIALS_____

Tenant's agents, employees, contractors, invitees, successors or others using the Property with Tenant's expressed or implied permission.

Section 13.05. **Incorporation of Prior Agreements; Modifications.** This Lease is the only agreement between the parties pertaining to the lease of the Property and no other agreements are effective. All amendments to this Lease shall be in writing and signed by all parties. Any other attempted amendment shall be void.

Section 13.06. **Notices.** All notices required or permitted under this Lease shall be in writing and shall be personally delivered or sent by certified mail, return receipt requested, postage prepaid. Notices to Tenant shall be delivered to the address specified in Section 1.03 above, except that upon Tenant's taking possession of the Property, the Property shall be Tenant's address for notice purposes. Notices to Landlord shall be delivered to the address specified in Section 1.02 above. All notices shall be effective upon delivery. Either party may change its notice address upon written notice to the other party.

Section 13.07. **Waivers.** All waivers must be in writing and signed by the waiving party. Landlord's failure to enforce any provision of this Lease or its acceptance of rent shall not be a waiver and shall not prevent Landlord from enforcing that provision or any other provision of this Lease in the future. No statement on a payment check from Tenant or in a letter accompanying a payment check shall be binding on Landlord. Landlord may, with or without notice to Tenant, negotiate such check without being bound to the conditions of such statement.

Section 13.08. **No Recordation.** Tenant shall not record this Lease without prior written consent from Landlord. However, either Landlord or Tenant may require that a "Short Form" memorandum of this Lease executed by both parties be recorded. The party requiring such recording shall pay all transfer taxes and recording fees.

Section 13.09. **Binding Effect; Choice of Law.** This Lease binds any party who legally acquires any rights or interest in this Lease from Landlord or Tenant. However, Landlord shall have no obligation to Tenant's successor unless the rights or interests of Tenant's successor are acquired in accordance with the terms of this Lease. The laws of the state in which the Property is located shall govern this Lease.

Section 13.10. **Corporate Authority; Partnership Authority.** If Tenant is a corporation, each person signing this Lease on behalf of Tenant represents and warrants that he has full authority to do so and that this Lease binds the corporation. Within thirty (30) days after this Lease is signed, Tenant shall deliver to Landlord a certified copy of a resolution of Tenant's Board of Directors authorizing the execution of this Lease or other evidence of such authority reasonably acceptable to Landlord. If Tenant is a partnership, each person or entity signing this Lease for Tenant represents and warrants that he or it is a general partner of the partnership, that he or it has full authority to sign for the partnership and that this Lease binds the partnership and all general partners of the partnership. Tenant shall give written notice to Landlord of any general partner's withdrawal or addition. Within thirty (30) days after this Lease is signed, Tenant shall deliver to Landlord a copy of Tenant's recorded statement of partnership or certificate of limited partnership.

Section 13.11. **Joint and Several Liability.** All parties signing this Lease as Tenant shall be jointly and severally liable for all obligations of Tenant.

INITIALS_____

INITIALS_____

H:\NIGRONER 1, 2 & NLVLease NNN Eric ER1- Mod 1-17-2005.doc as if 1/19/2005 2:40 PM

Section 13.12. **Force Majeure.** If Landlord cannot perform any of its obligations due to events beyond Landlord's control the time provided for performing such obligations shall be extended by a period of time equal to the duration of such events. Events beyond Landlord's control include, but are not limited to, acts of God, war, civil commotion, labor disputes, strikes, fire, flood or other casualty, shortages of labor or material, government regulation or restriction and weather conditions.

Section 13.13. **Execution of Lease.** This lease may be executed in counterparts and, when all counterpart documents are executed, the counterparts shall constitute a single binding instrument. Landlord's delivery of this Lease to Tenant shall not be deemed to be an offer to lease and shall not be binding upon either party until executed and delivered by both parties.

Section 13.14. **Survival.** All representations and warranties of Landlord and Tenant shall survive the termination of this Lease.

Section 13.15. **Standard Airport Ground Lease.** Landlord and Tenant acknowledge that Lessee is signatory to that certain lease attached as Exhibit C. Landlord and Tenant are subject to the terms and conditions of said Lease.

ARTICLE FOURTEEN:     **BROKERS**

Section 14.01. **Broker's Fee.** When this Lease is signed by and delivered to both Landlord and Tenant, Landlord shall pay a real estate commission to Landlord's Broker named in Section 1.08 above, if any, as provided in the written agreement between Landlord and Landlord's Broker, or the sum stated in Section 1.09 above for services rendered to Landlord by Landlord's Broker in this transaction. Nothing contained in this Lease shall impose any obligation on Landlord to pay a commission or fee to any party other than Landlord's Broker.

Section 14.02. **Protection of Brokers.** If Landlord sells the Property, or assigns Landlord's interest in this Lease, the buyer or assignees shall, by accepting such conveyance of the Property or assignment of the Lease, be conclusively deemed to have agreed to make all payments to Landlord's Broker thereafter required of Landlord under this Article Fourteen. Landlord's Broker shall have the right to bring a legal action to enforce or declare rights under this provision. The prevailing party is such action shall be entitled to reasonable attorneys' fees to be paid by the losing party. Such attorneys' fees shall be fixed by the court in such action. This Paragraph is included in this Lease for the benefit of Landlord's Broker.

Section 14.03. **Agency Disclosure; No Brokers.** Landlord and Tenant each Warrant that they have dealt with no real estate broker(s) in connection with transaction.

ARTICLE FIFTEEN: **COMPLIANCE**
The parties hereto agree to comply with all applicable federal, state and local laws, regulations, codes, ordinances and administrative orders having jurisdiction over the parties, property or the subject matter of this Agreement, including, but not limited to, the 1964 Civil Right Act and all amendments thereto, the Foreign Investment in Real Property Tax Act, the Comprehensive Environmental Response Compensation and Liability Act, and The Americans With Disabilities Act.

ADDITIONAL PROVISIONS MAY BE SET FORTH IN A RIDER OR RIDERS ATTACHED HERETO OR IN THE BLANK SPACE BELOW. IF NO ADDITIONAL PROVISIONS ARE INSERTED, PLEASE DRAW A LINE THOUGH THE SPACE BELOW.

INITIALS_____

INITIALS

Landlord and Tenant have signed this Lease at the place and on the dates specified adjacent to their signatures below and have initialed all Riders which are attached to or incorporated by reference in this Lease.

Landlord:
ER 1, LLC
**a Delaware limited liability company**

By: _____
    Manager
Date: _____

Tenant:
Quick-Turn Technologies, LLC
**a Nevada limited liability company**

By: _____
Title: _____
Date: _1 - 2 0 - 0 5_

Tenant:
Aircraft Investor Resources, LLC
**a Nevada limited liability company**

By: _____
Title: _____
Date: _____

Tenant:
TAM-AIR Inc., a Delaware corporation

By: _____
Title: _____
Attest _____
       Secretary

Date: _1 - 2 4 - 0 5_

IN ANY REAL ESTATE TRANSACTION, IT IS RECOMMENDED THAT YOU CONSULT WITH PROFESSIONAL, SUCH AS A CIVIL ENGINEER, INDUSTRIAL HYGIENIST OR OTHER PERSON WITH EXPERIENCE IN EVALUATING THE CONDITION OF THE PROPERTY, INCLUDING THE POSSIBLE PRESENCE OF ASBESTOS, HAZARDOUS MATERIALS AND UNDERGROUND STORAGE TANKS.

INITIALS _____

INITIALS _____

H:\NLIGROUER 1, 2 & NLV\Lease NNN Eric ER1- Mod 1-17-2005.doc as if 1/19/2005 3:25 PM

# OPTION TO EXTEND TERM
# LEASE RIDER

This rider is attached to and made part of that certain Lease (the "Lease") dated <u>January 17, 2005</u> between <u>ER I, LLC, a Delaware limited liability company</u>, as Landlord, and <u>Quick-Turn Technologies, LLC, a Nevada limited liability company, and Aircraft Investor Resources, LLC, a Nevada limited liability company, TAM-AIR LLC, a Delaware corporation</u> as Tenant, covering the Property <u>located at Bend Airport, Bend Oregon and is composed of a 90,000 square foot manufacturing and aircraft storage facility with associated on-site improvements</u> (the "Property"). The terms used herein shall have the same definitions as set forth in the Lease. The provisions of this Rider shall supersede any inconsistent or conflicting provisions of the Lease.

A.     **Option(s) to Extend Term.**

1.     Landlord hereby grants to Tenant <u>two (2)</u> option(s) (the "Option(s)") to extend the Lease Term for additional term(s) of <u>ten (10)</u> years each (the "Extension(s)"), on the same terms and conditions as set forth in the Lease, but at an increase rent as set forth below. Each Option shall be exercised only by written notice delivered to Landlord at least <u>eighteen (18) months</u> before the expiration of the Lease Term or the preceding Extension of the Lease Term, respectively. If Tenant fails to deliver Landlord written notice of the exercise of an Option within the prescribed time period, such Option and any succeeding Options shall lapse, and there shall be no further right to extend the Lease Term. Each Option shall be exercisable by Tenant on the express conditions that (a) at the time of the exercise, and at all times prior to the commencement of such Extension, Tenant shall not be in default under any of the provisions of the Lease and (b) Tenant has not been ten (10) or more days late in the payment of rent more than a total of three (3) times during the Lease Term and all preceding Extensions.

2.     **Personal Options.**

The Option(s) are personal to the Tenant named in Section 1.03 of the Lease or any Tenant's Affiliate described in Section 9.02 of the Lease. If Tenant subleases any portion of the Property or assigns or otherwise transfers any interest under the Lease to an entity other than a Tenant Affiliate prior to the exercise of an Option (whether with or without Landlord's consent), such Option and any succeeding Options shall lapse. If Tenant subleases any portion of the Property or assigns or otherwise transfers any interest of Tenant under the Lease to an entity other than a Tenant Affiliate after the exercise of an Option but prior to the commencement of the respective Extension (whether with or without Landlord's consent), such Option and any succeeding Options shall lapse and the Lease Term shall expire as if such Option were not exercised. If Tenant subleases any portion of the Property or assigns or otherwise transfers any interest of Tenant under the Lease in accordance with Article 9 of the Lease after the exercise of an Option and after the commencement of the Extension related to such Option, then the term of the Lease shall expire upon the expiration of the Extension during which sublease or transfer occurred and only the succeeding Options shall lapse.

B.     **Calculation of Rent.**

The Base Rent during the Extension(s) shall be determined by one Cost of Living Adjustment.

The Base Rent shall be increased on the first day of the thirteenth months(s) of the two (2), ten (10) year Extension period(s) of the Lease Term (the "Rental Adjustment Date") by reference to the Index defined in Sections 1.13(a) of the Lease or the substitute index described in Section 3.02 of the Lease, as follows: The Base Rent in effect immediately prior to the applicable Rental Adjustment Date (the "Comparison Base Rent") shall be increased by the percentage that the Index has increased from the month in which the payment of the Comparison Base Rent commenced through the month in which the applicable Rental Adjustment Date occurs. In no event shall the Base Rent by reduced by reason of such computation.

INITIAL_____

_____

1

INITIAL 

## ADDENDUM

To the lease dated January 17, 2005, by and between <u>ER 1, a Delaware limited liability company,</u> "Landlord" and <u>Quick-Turn Technologies, LLC & Aircraft Investor Resources, LLC,</u> "Tenant" for the premises located at <u>Bend Airport, Bend Oregon and is composed of a 90,000 square foot manufacturing and aircraft storage facility with associated on-site improvements,</u> Las Vegas, Nevada, is hereby incorporated and made a part:

1. Landlord hereby agrees to build out 90,000 square feet of the Tenant Improvements identified in the Chambers Construction Budget attached hereto at a cost of $13.59 per square foot ($1,223,100.00).  Tenant agrees to reimburse Landlord $6.79 per square foot ($611,100.00).   As these Tenant Improvements are built simultaneously with the construction of the improvements the $611,100.00 is due and payable upon execution of the lease agreement.

All other terms and conditions shall remain the same.

**Landlord:**
**ER 1, LLC**
**a Delaware limited liability company**

By: _____
   Manager

Date: _____

**Tenant:**
**Quick-Turn Technologies, LLC**
**a Nevada limited liability company**

By: _____
Title: _____

Date: _____

**Tenant:**
**Aircraft Investor Resources, LLC**
**a Nevada limited liability company**

By: _____
Title: _____

Date: _____

**Tenant:**
**TAM-AIR Inc., a Delaware corporation**

By: _____
Title: _____

Attest: _____
      Secretary

Date: _____

INITIALS _____

INITIALS _____

# EXHIBIT A



DAVID EVANS
ASSOCIATES

### LEASE AREA

### EPIC AIR

A portion of the northwest one-quarter of Section 20, Township 17 South, Range 13 East, Willamette Meridian, Deschutes County, Oregon, as shown on the attached map and fully described as follows:

Commencing at a 3 ¼" aluminum cap in a monument box at the southwest corner of said northwest one-quarter; thence along the south boundary of said northwest one-quarter, North 89°57'45" East 2649.35 feet to a 3 ¼" brass cap at the southeast corner of said northwest one-quarter; thence leaving said south boundary, North 13°22'52" West 2074.48 feet to the point of beginning; thence North 220.00 feet; thence West 360.00 feet; thence North 240.00 feet; thence East 678.00 feet; thence South 460.00 feet; thence West 318.00 feet to the point of beginning. Contains 232,680 square feet.



March 18, 2005